# Ethics Issues Related to the Federal Technology Transfer Act of 1986

A government employee-inventor who assigns his rights in an invention to the United States and accepts the government's payment of amounts tied to the resulting royalties, as provided in the Federal Technology Transfer Act of 1986, may continue to work on the invention without violating the statute against taking part in matters in which he has a financial interest, 18 U.S.C. § 208, or the statute forbidding supplementation of federal salaries, 18 U.S.C. § 209

Under 18 U.S.C § 208, a government employee-inventor may not take official action with respect to an agreement for development of his invention entered into by the United States and a company with which the employee has contracted to exploit the invention abroad.

September 13, 1993

MEMORANDUM OPINION FOR THE DIRECTOR
OFFICE OF GOVERNMENT ETHICS

You have asked us to advise whether we agree with a September 27, 1988, letter from the Office of Government Ethics ("OGE") to the Department of Commerce ("1988 OGE letter") and to review a draft OGE letter to the Special Counsel for Ethics at the Department of Health and Human Services ("draft OGE letter"). Both letters address issues involving the relationship between federal conflict-of-interest laws and the Federal Technology Transfer Act of 1986 ("FTTA"), as amended, 15 U.S.C. §§ 3701-3717. We believe that the 1988 OGE letter was correct in concluding that payments to a government employee under FTTA section 7 do not violate 18 U.S.C. § 208 or 18 U.S.C. § 209(a). We also agree with the conclusion of the draft OGE letter that, on the specific facts stated there, § 208 bars an employee from working in his official capacity on an invention for which the employee holds a foreign patent, and for which the employee has contracted for foreign commercialization with the same company that is under contract with the federal government to develop the invention.

I.

Congress enacted the FTTA in 1986 as part of a continuing effort to encourage technology transfers from federal research laboratories to private industry. The FTTA amended the Stevenson-Wydler Technology Innovation Act of 1980, Pub. L. No. 96-480, 94 Stat. 2311, which created incentives for federal agencies and employees to work with private industry in commercializing new technologies developed in federal laboratories.[1] To this end, section 7 of the FTTA requires a

---

[1] *See, e.g.,* 132 Cong. Rec. 20,388 (1986) (statement of Sen. Gorton) ("The FTTA is designed to improve the transfer of technology out of the Federal laboratories and into the marketplace. . . . It improves the

government agency to "pay at least 15 percent of the royalties or other income the agency receives on account of any invention to the inventor . . . if the inventor . . . assigned his or her rights in the invention to the United States." 15 U.S.C. § 3710c(a)(1)(A)(i). Once section 7 payments are made to an employee-inventor, the individual generally will continue to work on the development and improvement of the invention, including its commercialization as part of federal research and development efforts. These efforts may include a cooperative research and development agreement ("CRADA"). CRADAs are cooperative agreements with universities or other entities in the private sector and are aimed at refining an invention and transferring it to the marketplace. They are specifically authorized under section 2 of the FTTA.[2]

At the same time, federal ethics laws generally prohibit government employees from personally participating in matters where they have a "financial interest." Under 18 U.S.C. § 208:

> Except as permitted by subsection (b) hereof [concerning waivers and other exclusions], whoever, being an officer or employee of the executive branch of the United States Government . . . participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which, to his knowledge, he . . . has a financial interest — Shall be subject to the penalties set forth in section 216 of this title.

18 U.S.C. § 208(a).[3] If amounts paid to government employees under FTTA section 7 constitute a "financial interest" in the invention, then the employee-inventor probably would be forbidden to continue working on the project while receiving section 7 payments.

---

incentives for Federal scientists to put in the time and effort to explore the commercial possibilities of their inventions by requiring agencies to share at least 15 percent of the royalties received from patents with the inventor.")

[2] Section 2 provides in relevant part:

Each Federal agency may permit the director of any of its Government-operated Federal laboratories, and, to the extent provided in an agency-approved joint work statement, the director of any of its Government-owned, contractor-operated laboratories —

(1) to enter into cooperative research and development agreements on behalf of such agency . and

(2) to negotiate licensing agreements . . for inventions made or other intellectual property developed at the laboratory and other inventions or other intellectual property that may be voluntarily assigned to the Government

15 U.S.C § 3710a(a).

[3] Section 216 provides both civil and criminal penalties for violations of § 208. 18 U S C. § 216

In 1988, OGE resolved this apparent conflict by concluding that amounts paid to federal employees under section 7 constitute compensation from the government and that such compensation does not constitute "a financial interest" under § 208. While the 1988 opinion was not reviewed by this Office at that time, it is consistent with views we expressed in an earlier opinion. In 1980, this Office concluded that § 208(a) does not cover a situation "in which the only financial interest in the [particular matter] is that which federal employees have in their government position and salary, as to which no outside financial interest is implicated." *See* Memorandum for Thomas Martin, Deputy Assistant Attorney General, Civil Division, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: 18 U.S.C. § 208 and Pending Salary Adjustment Litigation* at 3 (Jan. 24, 1980) ("1980 Opinion").[4]

The question whether the term "financial interest" as used in § 208 covers compensation received by a government employee in connection with his government employment has never been conclusively settled.[5] As in any task of statutory construction, we begin with the text, *see, e.g., United States v. Turkette,* 452 U.S. 576, 580 (1981) ("In determining the scope of a statute, we look first to its language."), and are bound by the "fundamental canon" that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States,* 444 U.S. 37, 42 (1979). Section 208 does not define the term "financial interest." It could be interpreted to refer to any number of potential monetary or other personal interests of a covered person, including an individual's federal compensation.

---

[4] In 1985 and again in 1987, we admittedly questioned the correctness of the 1980 Opinion in light of the "plain language" of § 208(a) *See* Memorandum for Richard K. Willard, Assistant Attorney General, Civil Division, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel, *Re 18 U.S.C § 208 and Participation of Departmental Attorneys in Debt Ceiling Litigation* at 2 n 1 (Dec. 6, 1985); Memorandum for the Solicitor of the Interior, from Samuel A. Alito, Jr, Deputy Assistant Attorney General, Office of Legal Counsel, *Re Scope of the Term "Particular Matter" Under 18 U.S.C 208* at 9 n 13 (Jan. 12, 1987) Notwithstanding those opinions, we adhere to our 1980 Opinion.

[5] The only case arguably on point is *United States v. Lund,* 853 F.2d 242 (4th Cir. 1988) In that case, the court applied § 208 to interests arising from a federal employee's government salary. The facts of that case, however, are unique. The defendant was a federal manager who married a subordinate and kept their marriage secret. The defendant continued to supervise his wife and, over time, granted her higher pay, promoted her over another applicant, and recommended her for a government-funded graduate school program

This conduct was found to violate § 208. The specific issue before the Court, however, was whether § 208(a) was "applicable to conflicts of interest in intra-agency personnel matters." *Id.* at 243. Based upon the statute's plain language, the Court concluded that § 208(a) was applicable to such conflicts, rejecting the argument that the statute's "reach is limited to conflicts of interest in matters involving outside suppliers of goods and services to the government." *Id.* at 244.

The implication of the *Lund* court's decision was that a federal employee's spouse's employment contract represented a § 208 "financial interest," even if that contract was with the federal government. The Court did not, however, directly address the issue whether the covered employee's own federal employment contract could constitute a "financial interest" giving rise to a prohibited conflict. Moreover, it is significant that the arrangement was kept secret As will be discussed *infra,* Congress appears to have been principally concerned with financial interests that would not be known to the agency involved In any case, it is unclear whether *Lund* could be extended beyond its very peculiar facts.

It is also true, however, that in "ascertaining the plain meaning of [a] statute, the court must look to . . . the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988).[6] In this regard, the provisions of § 208(b) may illuminate the meaning of subsection (a). Section 208(b) provides that:

> Subsection (a) hereof shall not apply (1) if the officer or employee first advises the Government official responsible for appointment to his position of the nature and circumstances of the judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter and makes full disclosure of the financial interest and receives in advance a written determination made by such official that the interest is not so substantial as to be deemed likely to affect the integrity of the services which the Government may expect from such officer or employee.

18 U.S.C. § 208(b).

The creation of a procedure whereby employees may obtain exceptions from the prohibitions of subsection (a) upon disclosure of their financial interest indicates that Congress was not referring to "financial interests" that need no disclosure, such as the compensation a federal employee receives from the government. This rationale led to our original determination that the compensation received by federal employees was not a "financial interest" within the meaning of § 208(a). As noted in the 1980 Opinion, the full disclosure requirements of § 208(b) "suggest that the interest of concern is one that, without such disclosure, would not be ordinarily known to the appointing official. Otherwise, there would appear to be no logical or practical reason for requiring 'full disclosure' by the federal employee." 1980 Opinion at 2.

This interpretation of § 208 is supported by its legislative history. Section 208 was enacted in its present form in 1962. Before its enactment, 18 U.S.C. § 434 forbade federal employees from acting for the United States in the transaction of business with any business entity in which they were "directly or indirectly interested in the pecuniary profits or contracts." 18 U.S.C. § 434 (1958). In 1962 § 434 was replaced by § 208, which was intended to broaden the scope of its prohibitions — in particular to cover financial interests held by the spouse, children and partners of covered persons. However, as noted in our 1980 Opinion, it is doubtful that Congress meant to "sweep within § 208's ambit every conceivable financial interest of whatever type." 1980 Opinion at 3. For example, the Senate Report on the bill that became § 208 explained that:

---

[6] *See also Richards v United States,* 369 U S. 1 (1962), *Federal Power Comm'n v Panhandle Eastern Pipe Line Co* , 337 U S 498 (1949)

> The disqualification of the subsection embraces any participation on behalf of the Government in a matter in which the employee *has an outside financial interest*, even though his participation does not involve the transaction of business.

*Id.* (citing S. Rep. No. 87-2213, at 13 (1962)) (emphasis added). Thus, § 208 was enacted to extend the reach of federal conflict-of-interest prohibitions to cover the "outside" financial interests of a covered employee — those interests outside of the individual's federal employment contract that would not necessarily be evident to the employee's superiors. Examples would include personal investments or the financial interests of an employee's family or business partners. There is little evidence that Congress meant also to encompass the employee's interest in his own federal compensation.

Indeed, if "financial interest" is interpreted to include compensation received from the federal government, the section could lead to absurd results. If an employee's federal salary were characterized as a "financial interest" under § 208(a), any action taken with the intent to increase that salary — enthusiastically and conscientiously performing his or her duties in the hope of promotion for example — might be forbidden by that section. Or an employee who must decide claims brought against the United States — a Social Security hearing officer for example — might well violate § 208 whenever he or she decides in favor of the federal government. An employee might be said to have a conflicting "financial interest" in protecting the federal treasury, from which his or her own livelihood is drawn, and § 208(a) expressly reaches the financial interests of the government employee's employer. There appears to be no principled distinction that would exclude such actions or determinations made by an officer or employee from § 208's reach, if federal compensation is considered a "financial interest." Such an interpretation of the statute would subject federal employees to possible prosecution under § 208 for the vigilant performance of their duties.

In addition, we note that Congress enacted the FTTA against the background of the conflict-of-interest laws, including § 208. It is well settled that statutes must be construed as consistent if possible, and that an earlier statute should not be read broadly when the result would be to circumvent a later enactment. *See Watt v. Alaska*, 451 U.S. 259, 266-67 (1981); *Patterson v. McLean Credit Union*, 491 U.S. 164, 181 (1989). In this connection, we note that the Supreme Court has declined to interpret federal conflict-of-interest laws broadly when the effect would be to forbid activity specifically authorized by Congress in a later enactment. *See United States v. Chemical Found., Inc.*, 272 U.S. 1, 17-19 (1926) (predecessor statute of § 208 does not cover transactions authorized under later measure passed to deal with wartime conditions).[7] We believe that § 208 can and should be interpreted as consistent with the provisions of the FTTA.

Payments made to employees under FTTA section 7 are federal compensation, indistinguishable for these purposes from salary, benefits, and other payments such as performance awards. The 1988 OGE letter concluded that royalty payments made under section 7 should be viewed as "additional compensation for Federal service," noting that the United States retains ownership rights in the invention under FTTA section 7 and that the inventor receives his or her share in the royalty payments from the United States, not directly from the outside licensee. This conclusion finds additional support in section 7, which provides that employees can receive payments in excess of $100,000 under this program *only* with the approval of the President under the provisions regarding presidential cash awards — 5 U.S.C. § 4504. 15 U.S.C. § 3710c(a)(3).

Therefore, we conclude that compensation received by an employee under FTTA section 7 does not constitute a "financial interest" under § 208. Such employees may receive payments under section 7 and continue to work on the development and commercialization of their inventions.[8]

## II.

In addition, we agree with the 1988 OGE letter's conclusion that FTTA section 7 payments are not prohibited supplementations of salary under 18 U.S.C. § 209(a). Section 209(a) prohibits federal employees from receiving any supplementation of salary in consideration of the performance of their official duties "from any source other than the Government of the United States." Since an employee receives section 7 payments from the federal agency holding the rights to the invention, the payments are not subject to § 209(a)'s prohibition.

## III.

The draft OGE letter concerns section 8 of the FTTA. Under that section, when an agency having the right to ownership of an invention

---

[7] *See also Busic v United States*, 446 U.S 398, 406 (1980) (more specific statute given precedence over more general one, regardless of sequence of enactment).

We acknowledge that the Senate report on the FTTA stated that the provisions of the bill "ma[d]e no changes in the conflict of interest laws affecting Federal employees or former Federal employees" S Rep No. 99-283, at 10 (1986) This statement, however, could indicate that the Congress that passed the FTTA may well have believed that § 208 did not reach any forms of compensation by the government

[8] Given this conclusion, it follows that an employee entitled, or potentially entitled, to payments under section 7 also may work on an invention pursuant to a CRADA, without violating § 208 It would be entirely arbitrary to conclude that an employee could work on an invention potentially leading to such payments before, but not after, a CRADA is signed by the federal laboratory that employs him. He would have the same interest in the potential payments, and the substance of his research would likely be the same, both before and after his laboratory entered into the CRADA. Furthermore, the FTTA expressly contemplates that employees, in at least some circumstances, will continue to work on their inventions under CRADAs. · 15 U.S C. § 3710a(b)(5) Application of § 208 would mean that, absent a waiver, employees could *never* do such work under CRADAs, because successful work would enable the employees to receive larger payments under section 7. There is no indication that Congress intended such a result

does not intend to file for a patent application or otherwise to pro-
mote commercialization of such invention, the agency shall allow
the inventor, if the inventor is a Government employee or former
employee who made the invention during the course of employment
with the Government, to retain title to the invention [subject to res-
ervation of a nonexclusive, license for the Government].

15 U.S.C. § 3710d(a). Under this provision and implementing regulations, an
agency may determine to prosecute a patent application in the United States, but
not abroad, leaving foreign rights to the employee-inventor. 37 C.F.R. § 101.8
(1993).

The draft OGE letter addresses a case in which the federal government, while
choosing to commercialize an invention in this country, has permitted the inventors
to retain foreign patent rights. Specifically, three federal employee-inventors share
the rights to obtain certain foreign patents. The United States owns the domestic
patent. These individuals have obtained some foreign patent rights and have en-
tered a licensing agreement with a private firm, granting it the right to exploit the
inventions overseas in exchange for royalties. Draft OGE letter, at 2-3. At the
same time, the agency employing the three inventors has awarded an exclusive
license to develop and exploit the inventions domestically to the same licensee.
Moreover, the agency intends to enter a CRADA with the licensee under which
that firm would handle the clinical trials necessary to test and evaluate the inven-
tion for the marketplace. "Thus, the private firm has an exclusive license for both
the Government's domestic patent rights and the employee-inventors' foreign pat-
ent rights, plus a research and development agreement with the Government to
develop and test the product." *Id.* at 4. Two of the three employee-inventors will
be directly involved, as part of their official duties, with work related to the inven-
tion through the CRADA. It is, in fact, "typical for the inventor and the Govern-
ment to enter into licensing agreements with the same firm" and "it is often in the
Government's best interest to allow inventors who hold foreign rights to continue
to develop their work." *Id.* at 4.

OGE has concluded that the employee-inventors have a § 208 "financial inter-
est" in their inventions "because they own the foreign patent rights from which they
receive royalties," and that they cannot, therefore, "officially act on any matter
involving the private firm to which they assigned their patent rights. This prohibi-
tion would include work by the employee-inventors on the research and develop-
ment agreement with the private firm." *Id.* at 5. In distinguishing these interests
from the interest of an employee-inventor in section 7 royalty payments, OGE
notes that here the inventors, not the United States, own the patent rights and that
they consequently are "placed into a direct relationship with the party paying roy-
alty fees." *Id.* Moreover, OGE points out that the licensing agreement itself con-
stitutes a § 208 "financial interest."

We agree with OGE that the employee-inventors are prohibited by § 208(a) from taking official action involving the CRADA between the United States and their licensee. The license agreement between the employee-inventors and the government's contractor appears to constitute a "financial interest" under § 208(a). Accordingly, the employee may not participate "through decision, approval, disapproval, recommendation, the rendering of advice, investigation or otherwise," in the performance or administration of the CRADA. We do not, however, believe it necessary to determine whether the inventor-employees' interest in foreign patent rights constitutes a "financial interest" that in itself would prohibit them from otherwise continuing the government's research into this invention. While the employee-inventors' section 8 ownership interest in the foreign patent rights to the invention is distinguished from their royalty rights under section 7, both interests constitute an integral part of the FTTA incentive program created by Congress. Both arguably may be characterized as "compensation" to the employee, and there seems little reason to distinguish between the two interests — both of which will be known to the individuals' supervisors. It is unnecessary to resolve this broader question, and we decline to do so.[9]

> WALTER DELLINGER
> *Acting Assistant Attorney General*
> *Office of Legal Counsel*

---

[9] There does, however, appear to be a clear distinction between owning the patent rights themselves, and an interest in a licensing agreement under which those rights are exploited This would be analogous to an employee who receives section 7 royalty payments, and who invests those sums in the shares of a business corporation Such an employee would be forbidden by § 208(a) to participate in a CRADA with that corporation involving the employee's invention This is true not because the royalties, or patent rights under section 8 are a "financial interest," but because the employee's investment, or licensing agreement, is such an interest