**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**James Milton LUND,**
**Defendant–Appellee.**

No. 87–5642.

United States Court of Appeals,
Fourth Circuit.

Argued May 2, 1988.
Decided Aug. 1, 1988.

Michael K. Fee (G. Allen Carver, Jr., Public Integrity Section, Criminal Div., U.S. Dept. of Justice, Washington, D.C., on brief), for plaintiff-appellant.

Joseph B. Scott (William S. Aramony, Kator, Scott & Heller, Washington, D.C., on brief), for defendant-appellee.

Before PHILLIPS, SPROUSE and ERVIN, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

James Lund, an employee of the Defense Communications Agency, was indicted on three counts of violating the federal conflict-of-interest statute, 18 U.S.C. § 208(a), based on his alleged participation in three intra-agency personnel decisions in which his wife, who was one of his subordinates, had a financial interest. The district court dismissed the indictment on the ground that § 208(a) did not apply to conflicts of interest in intra-agency personnel matters. We find this narrow construction of § 208(a) to be inconsistent with the statute's plain and unambiguous language, as well as with its legislative history and purpose, and therefore reverse.

I

Lund was employed by the Defense Communications Agency (DCA) as Chief of Communications Management Control Activity. In December 1985, Lund married one of his subordinates, Judith Chaffee.

Lund and Chaffee did not disclose their marriage to the DCA. Over the next few years, the government contends, Lund participated in several personnel decisions involving Chaffee without disclosing their relationship to his superiors. Specifically, the government claims: (1) that in April 1986, Lund granted his wife a within-grade pay increase; (2) that in September 1986, he selected her over another applicant for promotion to a higher-paying position; and (3) that in October 1986, he recommended her for a masters' degree program funded by the United States government. Based on these allegations, the government sought and obtained an indictment charging Lund with three counts of violating the federal conflict-of-interest statute, 18 U.S. C. § 208(a), which provides:

[W]hoever, being an officer or employee of the executive branch of the United States Government [or] of any independent agency of the United States ... participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which, to his knowledge, he, his spouse, minor child, partner, organization in which he is serving as officer, director, trustee, partner or employee, or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest—

Shall be fined not more than $10,000, or imprisoned not more than two years, or both.

18 U.S.C. § 208(a).

Before trial, Lund moved to dismiss the indictment on the ground that § 208(a) was not applicable to conflicts of interest in intra-agency personnel matters. The government responded that Lund's actions fell squarely within the letter of the statute, because he had participated in a "contract" in which his wife had a financial interest—her employment contract—when

he granted her a salary increase, and in two "applications" in which she had a financial interest—her application for promotion to a higher-paying job and her application for government-funded graduate school. Alternatively, and only as a fallback position, the government argued that the catchall language "other particular matter" encompassed all three matters in which Lund was alleged to have participated.

The district court agreed with Lund and dismissed the indictment, 670 F.Supp. 654. The court reasoned that § 208(a) was "ambiguous" because the terms "contract," "application," and "other particular matter" were not defined and it was "[not] plain from the text of § 208 what contracts, applications, or matters Congress intended to criminalize and in what context these terms were to be applied." To resolve this alleged ambiguity, the district court turned first to the statute's legislative history, in which it found evidence that Congress intended § 208(a) to apply only to conflicts of interest in matters involving "outside suppliers of goods and services to the government," and thus, by implication, not to those arising in internal personnel matters. This view was confirmed, said the court, by the fact that another federal statute dealt specifically and comprehensively with the problem of nepotism in federal personnel matters. Finally, the court noted that although § 208(a) had been in existence more than 25 years, the government had never before used it to prosecute a conflict of interest in an internal personnel matter. Based upon these factors, together with the general principle that criminal statutes are to be strictly construed, the court concluded that § 208(a) was not applicable to the conduct charged in the indictment and therefore granted the motion to dismiss. This appeal followed.

## II

■ The sole issue in this case is whether the government may prosecute a federal employee under 18 U.S.C. § 208(a) for granting his spouse, who is one of his subordinates, a salary increase, selecting her over another applicant for promotion to a higher-paying position, and recommending her for government-funded graduate school.[1] Lund's attack on the indictment is twofold. He argues first that the statutory language is ambiguous and that consideration of extrinsic sources and canons of construction compels the conclusion that its reach is limited to conflicts of interest in matters involving outside suppliers of goods and services to the government. Second, he argues that even if the literal language of the statute is broad enough to reach the conduct at issue here, such an application of the statute is "precluded" by the existence of the Civil Service Reform Act of 1978 (CSRA), Pub.L. 95–454, 92 Stat. 1111 et seq. (codified as amended in scattered sections of 5 U.S.C.), which contains two provisions dealing specifically with the problem of nepotism in federal personnel matters.

We begin, of course, with the language of the statute itself. *United States v. Jackson*, 759 F.2d 342, 344 (4th Cir.1985), quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring). Section 208(a) prohibits a federal officer or employee from "participat[ing] personally and substantially as a Government officer or employee ... in a[n] ... application, ... contract, ... or other particular matter in which, to his knowledge, ... his spouse ... has a financial interest." The language of the statute is plain and unambiguous: it proscribes a federal employee's participation, on behalf of the government, in *any* application or contract in which he knows his spouse has a financial interest. To create ambiguity in the words "application" and "contract," as they are used here, "requires some ingenuity." *Rothschild v. United States*, 179 U.S. 463, 465, 21 S.Ct. 197, 198, 45 L.Ed. 277 (1900). They are common words with well-established meanings that are more

---

**1.** We assume, for the purpose of ruling on this motion to dismiss, that Lund participated personally and substantially in the decisions referred to in the indictment, and that he did so with knowledge that his wife had a financial interest in their outcome.

than adequate to give persons of ordinary intelligence fair notice of the conduct proscribed by the statute. *Cf. United States v. Conlon,* 628 F.2d 150, 154 (D.C.Cir.1980) (making similar observation about terms "negotiating" and "arrangement" in § 208(a)). Under the ordinary meaning of these statutory terms, Lund participated in a "contract" in which his wife had a financial interest—her employment contract with the federal government—when he granted her a salary increase, and in "applications" in which she had a financial interest when he selected her over another applicant for promotion to a higher-paying position and recommended her for government-funded graduate school.

Nor is the statute ambiguous in regard to the conduct charged here, as Lund suggests, because it contains no express mention of nepotism or of conflicts of interest in internal personnel decisions regarding salary increases, promotions, or government-funded graduate school. See Appellee's Brief at 15–16. The plain terms "contract" and "application" are, as indicated, broad enough to encompass the particular personnel decisions at issue here, and nothing on the face of the statute suggests a congressional intent to limit those terms to less than their normal reach. Resort to the principle of lenity, *see United States v. Bass,* 404 U.S. 336, 347–49, 92 S.Ct. 515, 522–23, 30 L.Ed.2d 488 (1971); *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059–60, 28 L.Ed.2d 493 (1971), is therefore inappropriate, for "there is no ambiguity that calls for a resolution in favor of lenity." *Barrett v. United States,* 423 U.S. 212, 218, 96 S.Ct. 498, 502, 46 L.Ed.2d 450 (1975); *see Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980) (the "touchstone" of the principle of lenity is "statutory ambiguity").

A

As the Supreme Court has repeatedly recognized, when the terms of a statute are unambiguous, "judicial inquiry is complete, except 'in "rare and exceptional circumstances" ' " *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981), quoting *TVA v. Hill,* 437 U.S. 153, 187 n. 33, 98 S.Ct. 2279, 2298 n. 33, 57 L.Ed.2d 117 (1978), quoting *Crooks v. Harrelson,* 282 U.S. 55, 60, 51 S.Ct. 49, 50–51, 75 L.Ed. 156 (1930). This principle, which is grounded in basic notions of separation of powers, is not to be deviated from simply because the statute being construed is criminal rather than civil. *See United States v. Albertini,* 472 U.S. 675, 680, 105 S.Ct. 2897, 2902, 86 L.Ed.2d 536 (1985); *Garcia v. United States,* 469 U.S. 70, 75, 105 S.Ct. 479, 482–83, 83 L.Ed.2d 472 (1984). Although criminal statutes are to be strictly construed, they are " 'not to be construed so strictly as to defeat the obvious intention of the legislature.' " *Huddleston v. United States,* 415 U.S. 814, 831, 94 S.Ct. 1262, 1271–72, 39 L.Ed.2d 782 (1974), quoting *American Fur Co. v. United States,* 2 Pet. 358, 367, 7 L.Ed. 450 (1829). When a penal statute's language is unambiguous, "only the most extraordinary showing" of legislative intent to the contrary will justify departure from its plain meaning. *Garcia,* 469 U.S. at 75, 105 S.Ct. at 482–83. No such showing has been made in this case. To the contrary, we think the legislative history and purpose of § 208(a) fully support its application to the conduct at issue here.

Section 208 was enacted in 1962 as part of a general revision of the criminal laws relating to bribery, graft, and conflicts of interest. Pub.L. No. 87–849, 76 Stat. 1124 (Oct. 23, 1962). This revision was motivated by widespread concern that the existing ethics laws were inadequate "to assure high ethical standards in the conduct of the Federal Government." H.R.Rep. No. 748, 87th Cong., 1st Sess. 2 (1962) [hereinafter House Report]; see S.Rep. No. 2213, 87th Cong., 2d Sess. 4–5 (1962) [hereinafter Senate Report], *reprinted in* 1962 U.S.Code Cong. & Ad.News 3852, 3853–54. The conflict-of-interest statute § 208(a) replaced, 18 U.S.C. § 434, had forbidden federal employees to act as the government's agent in the "transaction of business" with any "business entity" in which the employee himself held a financial interest. *See* 12 Stat. 696, 698 (1863), as amended, 35 Stat.

1088, 1097 (1909), as amended, 62 Stat. 683, 703 (1948), as amended, 76 Stat. 1119, 1124 (1962) (current version at 18 U.S.C. § 208). By its terms, § 434 applied only to conflicts of interest in business transactions between the government and outside entities, and thus not to those that arose in internal personnel matters. But § 434 was thought to be " 'not broad enough to protect the Government against the manifold modern forms of conflict of interest.' " House Report, *supra*, at 2, quoting Federal Conflict of Interest Legislation: Hearings before Subcomm. No. 5 of the House Comm. on the Judiciary, 86th Cong., 2d Sess. 388 (1960). As the House Report explained:

> The present law unduly restricts the activities to which it relates to "transaction of business" and fails to cover other personal and substantial participation in matters in which the employee has a personal interest. It also fails to proscribe participation in matters in which the employee's family, business associate or prospective employer has a financial interest.

House Report, *supra*, at 13; *see* Senate Report, *supra*, at 13–14, *reprinted in* 1962 U.S.Code Cong. & Ad.News at 3862.

Section 208 was designed to remedy the perceived inadequacies of § 434 by broadening its scope in two ways. First, it expanded the activity covered by the statute from the "transaction of business" on behalf of the government to participation in a wide range of governmental activities, from "arrests" and "judicial proceedings" to "applications," "contracts," and "other particular matters." Second, it expanded the financial interests that would trigger the statute from the employee's own to those of his immediate family, business associates, and anyone with whom he was negotiating concerning prospective employment. As the district court noted, portions of the legislative history of § 208 suggest that the Congress that enacted it was concerned primarily with expanding the conflict-of-interest provision's applicability to matters involving entities outside the government. *See, e.g.,* Senate Report, *supra*, at 14, *reprinted in* 1962 U.S.Code Cong. & Ad.News at 3862–63 (Section

208(a) deletes the word "business entity" in order "to make clear that improper dealing by a Government employee in connection with nonprofit organizations is also prescribed [sic].").

But the language of § 208(a), unlike that of its predecessor, is not restricted to conflicts of interest in matters involving outside entities, and nothing in the legislative history reveals a congressional intent to limit that broad language to less than its normal span. To the contrary, the legislative history indicates that Congress was fully aware of the potential breadth of the new statute. *See, e.g.,* House Report, *supra*, at 24 (Section 208(a) "would bar *any significant participation in Government action* in the consequences of which to his knowledge the employee [or those closely connected with him] ha[ve] a financial interest."). In fact, Congress thought the scope of § 208(a) so broad that it expressly provided several methods for obtaining exemptions from it. *See* 18 U.S.C. § 208(b). That the legislative history contains no specific mention of conflicts of interest in internal personnel matters cannot be taken as affirmative evidence that it did not intend the statute's sweeping language to reach them, for "[i]t is not necessary for Congress in its committee reports to identify all the 'weeds' which are being excised from the garden." *Standefer v. United States,* 447 U.S. 10, 20 n. 12, 100 S.Ct. 1999, 2006 n. 12, 64 L.Ed.2d 689 (1980). While it may be true that the Congress that enacted § 208(a) gave little thought to conflicts of interest in internal personnel matters, application of the statute's plain terms to that conduct is fully consistent with its broad purpose of " 'protect[ing] the Government against the manifold modern forms of conflict of interest.' " House Report, *supra,* at 2, quoting *Federal Conflict of Interest Legislation: Hearings before Subcomm. No. 5 of the House Comm. on the Judiciary,* 86th Cong., 2d Sess. 388 (1960).

In sum, we think the legislative history and purpose of 208(a) fully support giving its unambiguous terms the full breadth of their ordinary meaning. As the Court has said with increasing frequency in

recent years, " '[g]oing behind the plain language of a statute in search of a possibly contrary congressional intent is "a step to be taken cautiously" even under the best of circumstances.' " *United States v. Locke*, 471 U.S. 84, 95–96, 105 S.Ct. 1785, 1793, 85 L.Ed.2d 64 (1985), quoting *American Tobacco Co. v. Patterson*, 456 U.S. 63, 75, 102 S.Ct. 1534, 1540–41, 71 L.Ed.2d 748 (1982), quoting *Piper v. Chris–Craft Indus.*, 430 U.S. 1, 26, 97 S.Ct. 926, 941–42, 51 L.Ed.2d 124 (1977). Where, as here, "nothing in the legislative history remotely suggests a congressional intent contrary to Congress' chosen words, ... any further steps take the courts out of the realm of interpretation and place them in the domain of legislation." *Id.* at 96, 105 S.Ct. at 1793.[2] In circumstances such as these, complaints about the breadth of the statute are properly addressed to Congress rather than to the courts.

### B

■ Lund's second argument is that application of § 208 to his conduct, even if permitted by the statute's language and legislative history, is "precluded" by the existence of the Civil Service Reform Act of 1978 (CSRA), Pub.L. 95–454, 92 Stat. 1111 et seq. (codified as amended in scattered sections of 5 U.S.C.), which contains two provisions dealing specifically with the problem of nepotism in federal employment. *See* 5 U.S.C. § 2302(b)(7) (forbidding federal officers with authority to take personnel action to "appoint, employ, promote, advance, or advocate for appointment, employment, promotion, or advancement ... any individual who is a relative."); *id.* § 3110(b) (same). The CSRA, which was enacted 14 years after § 208, provides a comprehensive scheme of civil remedies, ranging from reprimands to termination of employment, to enforce the personnel practices it prohibits. Lund argues that these civil penalties were intended to be the exclusive remedy for the personnel practices prohibited by the CSRA—including nepotism—precluding any criminal sanctions that might otherwise attach to that conduct under § 208 or other federal statutes. As the government points out, this is really an argument of repeal by implication from a later-enacted statute. The argument is, in essence, that the passage of a statute specifically covering nepotism in federal employment somehow limits any application of the more general federal conflict-of-interest statute to that conduct. As such, it must be rejected, for Lund has not met the test necessary to show an implied repeal here.

The Supreme Court frequently has admonished that repeals of express statutory provisions by implication from later-enacted statutes are not favored, *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 189, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978), quoting *Morton v. Mancari*, 417 U.S. 535, 549, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974), quoting *Posadas v. National City Bank*, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936), and will not be found unless congressional intent to repeal is " 'clear and manifest.' " *United States v. Borden Co.*, 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939), quoting *Red Rock v. Henry*, 106 U.S. 596, 602, 27 L.Ed. 251 (1883). Instead, it is presumed that "Congress 'legislate[s] with knowledge of former related statutes,' and will expressly designate the provisions whose application it wishes to suspend, rather than leave that

---

**2.** That the government has never before attempted to prosecute a conflict of interest in an internal personnel matter under § 208(a) is not, as the district court suggested, persuasive evidence that Congress did not intend the statute to apply to that sort of conduct. As the Court noted in *Garcia,* the government " 'is not disqualified from changing its mind' concerning the construction of a statute." 469 U.S. at 79, 105 S.Ct. at 484, quoting *NLRB v. Iron Workers,* 434 U.S. 335, 351, 98 S.Ct. 651, 660–61, 54 L.Ed. 2d 586 (1978). Long-settled prosecutorial interpretation of an *ambiguous* statute as not reaching certain conduct may of course give rise to legitimate expectations that preclude its retroactive reinterpretation to cover that conduct, for due process requires that fair warning should be accorded as to what conduct is criminal. But those concerns are not present where, as here, "[t]he statute in question clearly proscribes [the defendant's] conduct and accorded him fair warning of the sanctions the law placed on that conduct." *Huddleston v. United States,* 415 U.S. 814, 831, 94 S.Ct. 1262, 1272, 39 L.Ed.2d 782 (1974).

248

consequence to the uncertainties of implication compounded by the vagaries of judicial construction." *United States v. Hansen,* 772 F.2d 940, 944–45 (D.C.Cir.1985) (citation omitted), quoting *Continental Ins. Co. v. Simpson,* 8 F.2d 439, 442 (4th Cir.1925). As Justice Scalia explained in an opinion written while he was a circuit judge:

> A steady adherence to [this principle of statutory interpretation] is important, primarily to facilitate not the task of judging but the task of legislating. It is one of the fundamental ground rules under which laws are framed. Without it, determining the effect of a bill upon the body of preexisting law would be inordinately difficult, and the legislative process would become distorted by a sort of blind gamesmanship, in which Members of Congress vote for or against a particular measure according to their varying estimations of whether its implications will be held to suspend the effects of an earlier law that they favor or oppose.

772 F.2d at 944 (holding that provisions of Ethics in Government Act creating civil penalties for failure to declare certain information in financial disclosure forms did not repeal by implication preexisting criminal penalties available for such misconduct under the False Claims Act).

Application of these principles requires us to reject Lund's claim that the CSRA repeals by implication the application of § 208(a) to nepotism in federal personnel matters. Lund bases his argument entirely upon two lines of authority, neither of which is persuasive.

The first is a series of cases holding that the comprehensive nature of the remedies available to federal employees under the CSRA preclude certain judicially-implied remedies for the personnel practices the CSRA prohibits. *See, e.g., United States v. Fausto,* —— U.S. ——, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988) (CSRA repeals by implication a right to judicial review of prohibited personnel practices implied by courts from the provisions of the Back Pay Act); *see also Limongelli v. Postmaster General of the United States,* 707 F.2d 368 (9th Cir.1983) (anti-nepotism provision of the

CSRA will not support implied private right of action). These cases are completely inapposite here, for as the Supreme Court specifically stated in *Fausto,* repeal by implication of a remedy implied by a court is a wholly different question than repeal by implication of an express provision of the statute itself. 108 S.Ct. at 676. While the former sort of repeal by implication is frequently found, as part of "th[e] classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination," the latter is properly found only where there is a "clear repugnancy" between the two statutory provisions. *id.,* citing *Georgia v. Pennsylvania Ry. Co.,* 324 U.S. 439, 456–57, 65 S.Ct. 716, 725–26, 89 L.Ed. 1051 (1945).

The second line of cases cited by Lund hold that the CSRA implicitly precludes a federal employee from seeking judicial review of challenged personnel decisions under the general provisions of the Administrative Procedures Act (APA), because "the comprehensive nature of the [grievance] procedures and remedies provided by the CSRA indicates a clear congressional intent to permit federal court review as provided in the CSRA or not at all." *Veit v. Heckler,* 746 F.2d 508, 511 (9th Cir.1984); *see Pinar v. Dole,* 747 F.2d 899, 912–13 (4th Cir.1984). While these cases do involve implied repeals of express statutory provisions, they too are ultimately unpersuasive. The question here is not whether the CSRA's comprehensive grievance procedures have implicitly repealed rights of judicial review of personnel decisions available to employees under other federal statutes; it is whether the CSRA's scheme of civil penalties for forbidden personnel practices has implicitly repealed the *government's* right to pursue criminal remedies for such misconduct that are available to it under other statutes. Lund has pointed to nothing in the statute itself or its legislative history that suggests Congress intended to limit the government's choice of penalties in this fashion. Indeed, the CSRA specifically authorizes the Special Counsel that handles cases arising under it to refer any evidence of criminal misconduct that he uncovers to the Attorney General for

criminal prosecution. *See* 5 U.S.C. § 1206(c)(2)(A). The existence of this referral mechanism suggests that Congress intended the CSRA's civil penalties to complement, rather than to preclude, any criminal penalties that might otherwise be available to redress the personnel practices it prohibits. Under these circumstances, we do not think Lund has made the showing necessary to justify a finding of repeal by implication.

### III

In sum, the plain and unambiguous language of § 208(a) covers the conduct charged in this indictment. We find nothing in the legislative history of § 208(a) or in its interaction with other statutes that justifies departing from the plain meaning of the statutory language. We therefore follow the letter of the statute and hold that § 208(a) applies to a federal employee's participation, on behalf of the government, in *any* application or contract in which he has a conflict of interest, not just those involving "outside suppliers of goods and services to the government." The judgment of the district court is therefore reversed, and the case is remanded for reinstatement of the indictment.

*REVERSED AND REMANDED.*