PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

v.

CURTIS LEE TERRY,
*Defendant-Appellee.*

No. 00-4856

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

v.

RONNIE WILLIAMS,
*Defendant-Appellee.*

No. 00-4902

Appeals from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Fox, Senior District Judge.
(CR-00-162-FO)

Argued: June 7, 2001

Decided: July 12, 2001

Before WILKINSON, Chief Judge, and MICHAEL and
KING, Circuit Judges.

Reversed and remanded by published opinion. Chief Judge Wilkinson
wrote the opinion, in which Judge Michael joined. Judge King wrote
an opinion concurring in the judgment.

## COUNSEL

**ARGUED:** Jennifer P. May-Parker, Assistant United States Attorney, Raleigh, North Carolina, for Appellant. Arthur Charles Zeidman, FEDERAL PUBLIC DEFENDER'S OFFICE, Raleigh, North Carolina; David William Venable, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Janice McKenzie Cole, United States Attorney, Anne M. Hayes, Assistant United States Attorney, Raleigh, North Carolina, for Appellant. Thomas P. McNamara, Federal Public Defender, Raleigh, North Carolina, for Appellees.

---

## OPINION

WILKINSON, Chief Judge:

We must decide whether the First Baptist Church of Raleigh, North Carolina was sufficiently "used in" interstate commerce under 18 U.S.C. § 844(i) (1994) to make arson of the church a federal crime. Because the church building contained a daycare center with significant commercial characteristics, we hold that the building fits within the terms of the statute. *See Jones v. United States*, 529 U.S. 848 (2000).

I.

On September 7, 2000, a federal grand jury charged Curtis Lee Terry and Ronnie Williams with arson, in violation of 18 U.S.C. § 844(i), and conspiracy to violate § 844(i). The United States alleges that Terry and Williams set fire to the First Baptist Church on August 12, 2000. Because this case comes to us after a dismissal of the indictment by the district court, we must assume that all facts proffered by the government are true. *See United States v. Lund*, 853 F.2d 242, 244 n.1 (4th Cir. 1988).

The defendants started two fires in the church, one in the office of the daycare center and the other in an auditorium. Before starting the fires, the defendants broke into the office of the daycare center, and

took blank checks which they drafted to themselves. Terry and Williams then burned the church "to cover evidence of the break-in."

The defendants moved to dismiss the indictment on the ground that the church identified in the indictment was not "used in" interstate commerce as required by § 844(i). At a hearing on the motion to dismiss, the United States conceded that the church building was first and foremost a place of worship. Nevertheless, the government presented the following evidence to show a nexus between the church and interstate commerce: the church employed and paid salaries to pastors, associate pastors, and a cleaning staff; some church employees had health insurance and retirement benefits administered through an annuity board of the Southern Baptist Convention, based in Dallas, Texas; the church was affiliated with the Cooperative Baptist Fellowship, based in Atlanta, Georgia; church members paid tithes to the church; the church had partnerships with organizations in other countries; the church subsidized charitable missions in various parts of the United States and internationally; the church provided food and clothing to members of the public; the church purchased bus tickets for needy persons; the church received Sunday school materials from a publisher in Macon, Georgia; the church hosted out-of-state speakers; and the church had out-of-state members.

The United States also presented evidence about a daycare center operating within the church building. The center was open from 7:30 a.m. to 5:30 p.m. daily. It occupied a main part of the church building. An organization independent of the church ran the daycare center. Parents who used the daycare center paid a monthly fee of $706. The daycare teachers were employed and paid by the center, not the church. The church did not collect rent from the daycare center. The daycare center did not make a profit.

The district court, for purposes of the motion to dismiss, assumed all these facts to be true. Nevertheless, the court dismissed the indictments against both Terry and Williams. The court stated that none of the facts proffered by the government established for purposes of § 844(i) that the building was used in interstate or foreign commerce,

or in an activity affecting interstate or foreign commerce. The United States now appeals.*

## II.

Section 844(i) provides in pertinent part, "Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building . . . used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned." 18 U.S.C. § 844(i).

In *Jones v. United States*, 529 U.S. 848 (2000), the Supreme Court held that § 844(i) did not reach the arson of an owner-occupied private residence. *See* 529 U.S. at 859. Neither the use of the dwelling as collateral for a mortgage from an out-of-state lender, the use of the dwelling to obtain an out-of-state insurance policy, nor the use of the dwelling to receive natural gas from sources outside the state permitted the private home to fall within the terms of § 844(i). *Id.* at 855. The Court stated that the qualifying words "used in" signaled Congress' intent not "to invoke its full authority under the Commerce Clause." *Id.* at 854.

The *Jones* court established a two-part inquiry to determine whether a building fits within the strictures of § 844(i). First, courts must inquire "into the function of the building itself." *Id.* at 854 (internal quotations omitted). Second, courts must determine "whether that function affects interstate commerce." *Id.* (internal quotations omitted). Because § 844(i) does not invoke Congress' full authority under the Commerce Clause, the Court explained that the qualification "'used' in an activity affecting commerce" is "most sensibly read to mean active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce." *Id.* at 855.

---

*We think it inadvisable to address the question raised by our concurring colleague in view of the fact that the only ground advanced by the government for reversal is that the activities of the First Baptist Church fell within the jurisdictional ambit of § 844(i), as defined by the *Jones* decision.

First, the church building had at least two functions. The unchallenged primary function of the building was religious in nature. The building operated as a house of worship. But the First Baptist Church was more than just a sanctuary. Rather, a secondary and important function of the building was to house the daycare center. The daycare center occupied a main part of the church building. It was open from 7:30 to 5:30 Monday through Friday. It employed its own teachers. It charged a fee of $706 per month.

The defendants argue, however, that the operation of the daycare center was not interstate commerce because the center was nothing more than a missionary outreach of the church. But it does not matter whether religion was one of the reasons or even the primary reason why the daycare center was located inside the church building. An activity can have both a religious aspect and an economic one. We cannot close our eyes to the commercial nature of an activity solely because non-commercial considerations also underlie it. A contrary rule would altogether prevent Congress from protecting places of worship from criminal misconduct, even when they served a plainly interstate commercial function.

The second step in the *Jones* analysis is to determine if the function of the building affects interstate commerce. This test requires "active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce." *Id.* Thus, if either the religious function of the church *or* the daycare center affected interstate commerce under the terms of the statute, the indictment must be sustained.

The United States takes the view that the religious function of the building standing alone affected interstate commerce. It points to evidence such as the church's out-of-state members, the church's employees who received a wage for their efforts, the church's affiliation with the Cooperative Baptist Fellowship which was based in another state, the church's sponsorship of international missions, the church's purchase of Sunday school materials from an out-of-state supplier, and the church's refurbishing of homes from which it could reasonably be inferred that the church purchased building materials which in turn impacted the nationwide market for construction goods and services. What the United States urges us to do, however, is sim-

ply not necessary to decide this case. Not only is the government's position much broader than it needs to be, it would also create a circuit split on this issue. *See United States v. Johnson*, 246 F.3d 749 (5th Cir. 2001) (per curiam) (holding that a church with tenuous interstate commerce connections did not fit within § 844(i)).

The effect of the daycare center on interstate commerce is by itself dispositive here. The daycare center charged parents $706 per month to safekeep and teach their children during the day. The function of the daycare center was to provide child care services in exchange for payment. Contrary to the defendants' assertions, the daycare center had more than a passing or passive connection to interstate commerce. Instead, the daycare center was actively engaged in commercial activity by participating in the market for childcare services. *See Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 586 n.18 (1997) (noting a $16 billion "market in child day care services"). The daycare center was not removed from or passively connected to commerce. Rather, the operation of the daycare center was itself a commercial activity. Regardless of the religious organization's effect on interstate commerce, the daycare center's presence transformed the building into one that was being actively employed for commercial purposes.

The fact that the daycare center did not make a profit does not change the analysis of whether the operation of the daycare center was a commercial activity. *See Camps Newfound*, 520 U.S. at 583-86. In *Camps Newfound*, the Supreme Court held that "the nonprofit character of an enterprise" does not "exclude it from the coverage of either the affirmative or the negative aspect of the Commerce Clause." *Id.* at 584. While the facts of *Camps Newfound* involved a not-for-profit camp in Maine, the Court made clear that its holding was not limited to summer camps. Instead, the Court pointed out that "[t]here are a number of lines of commerce in which both for-profit and nonprofit entities participate. Some educational institutions, some hospitals, some child care facilities, some research organizations, and some museums generate significant earnings; and some are operated by not-for-profit corporations." *Id.* at 585. The Court also specifically noted that "the $5 billion nonprofit market in child day care services competes with an $11 billion for-profit industry." *Id.* at 586 n.18. The *Camps Newfound* holding binds us here. The Court in *Camps New-*

*found* not only recognized that "[n]othing intrinsic to the nature of nonprofit entities prevents them from engaging in interstate commerce," *id.* at 585, it also emphasized that providing child care was a "service industr[y]" in which both for-profit institutions and nonprofit institutions compete. *Id.* at 586 n.18.

It is not dispositive that the commercial activity of providing daycare services took place entirely within the city of Raleigh. Since *United States v. Lopez*, 514 U.S. 549 (1995), the Supreme Court has emphasized that Congress' enumerated powers have judicially enforceable limits. But the Court has also upheld Congress' ability to aggregate the economic effects of local activities so long as those activities are commercial in nature. *See id.* at 559-60; *United States v. Morrison*, 529 U.S. 598, 610-11 (2000). To hold that local commercial activities like the child care center here do not affect commerce would call into question such cases as *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964). Such a limitation could impair Congress' ability to address national economic problems and stretch the judicial power beyond its proper constitutional role.

In *Russell v. United States*, 471 U.S. 858 (1985), a unanimous Supreme Court held that § 844(i) "unquestionably" applies to a "two-unit apartment building that is used as rental property." *Russell*, 471 U.S. at 858, 862. The Court stated that the "local rental of an apartment unit is merely an element of a much broader commercial market in rental properties." *Id.* at 862. Likewise, the $706 fee charged by the daycare center is an element of the much broader commercial market for childcare services. In both *Russell* and in the case at bar, the commercial use of the property brings the building within § 844(i)'s jurisdictional nexus.

## III.

Our holding is a limited one. Not all buildings, and not all churches, come within the ambit of § 844(i). *Jones* established that buildings which merely receive electricity and gas from interstate sources are not subject to the arson statute. Congress does not enjoy plenary power to usurp the states' traditional authority to denominate offenses like arson, larceny, burglary, vandalism, and other crimes against local property. Here, however, the presence of the daycare

center makes clear that the building was actively employed in commercial activities. Consequently, the indictment satisfies § 844(i)'s jurisdictional requirement. For the foregoing reasons, the judgment of the district court is reversed and the case is remanded with directions to reinstate the indictment.

*REVERSED AND REMANDED*

KING, Circuit Judge, concurring in the judgment:

Although I agree with the majority that the decision appealed from must be reversed and this case remanded for trial, I reach that conclusion through a separate route from my learned colleagues. I write separately to explain my position.

First of all, characterizing what occurred below as a dismissal of the indictment confuses the issue. It is elementary that a motion to dismiss an indictment implicates only the legal sufficiency of its allegations, not the proof offered by the Government. In most cases, "an indictment is sufficient if it alleges an offense in the words of the statute, assuming those words 'fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence.'" *United States v. Wicks*, 187 F.3d 426, 427 (4th Cir. 1999) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974) (internal citation omitted)).

There is no legal deficiency in this indictment. It alleges each essential element of a federal crime under § 844(i), and it asserts particularly that the First Baptist Church was "used in interstate and foreign commerce and in activity affecting interstate and foreign commerce." J.A. 41. The pretrial proceedings thus necessarily assaulted the Government's proof as outlined in the stipulated proffer, not the allegations of the indictment.

Second, it has been clear at least since the Supreme Court's decision in *United States v. Gaudin*, 515 U.S. 506 (1995), that an accused is entitled to have a jury decide each element of the offense with which he is charged. The jury's function is not merely to determine the existence vel non of the factual components underlying the essen-

tial elements, "but to apply the law to those facts and draw the ulti-mate conclusion of guilt or innocence." *Id.* at 514.

The mandate of *Gaudin* applies even to "jurisdictional" elements, and specifically to the interstate commerce element of the federal arson statute. *See United States v. Latouf*, 132 F.3d 320, 325 (6th Cir. 1997) ("Because the 'substantially affects interstate commerce' requirement is a jurisdictional element [of 18 U.S.C. § 844(i)], it must be proven to the jury beyond a reasonable doubt.") (citing *United States v. DiSanto*, 86 F.3d 1238, 1246 (1st Cir. 1996); *United States v. Pappadopoulos*, 64 F.3d 522, 524 (9th Cir. 1995)). The jury must be properly instructed, of course, taking into account the recent juris-prudence on the point. *See Jones v. United States*, 529 U.S. 848, 855 (2000) (holding § 844(i) element that subject property be "used" in activity affecting commerce to require "active employment for com-mercial purposes").

Third, even before *Gaudin*, the prevailing view was that the Gov-ernment's proof with respect to jurisdictional elements is subject to evaluation by the trial court solely in connection with a motion for judgment of acquittal made "after the evidence on either side is closed," as specified by Rule 29 of the Federal Rules of Criminal Proce-dure.[1] Such review may not ordinarily be undertaken in considering a pretrial motion to dismiss made pursuant to Rule 12(b). *See United States v. Nukida*, 8 F.3d 665, 669-70 (9th Cir. 1993) (in product tam-pering prosecution, Rule 12(b) motion to dismiss on ground that com-merce element was lacking "amounted to a premature challenge to the sufficiency of the government's evidence tending to prove a material element of the offense"); *United States v. Ayarza-Garcia*, 819 F.2d 1043, 1048 (11th Cir. 1987) ("[A] pretrial motion to dismiss the

---

[1]In setting forth the applicable procedure, Rule 29 provides, in perti-nent part:

> The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information *after the evidence on either side is closed* if the evidence is insufficient to sustain a conviction of such offense or offenses.

Fed. R. Crim. P. 29 (emphasis added).

indictment cannot be based on a sufficiency of the evidence argument because such an argument raises factual questions embraced in the general issue.").**[2]** The district court's preliminary ruling in this case regarding the sufficiency of the Government's evidence was therefore an aberration. It was, perhaps, a serious enough departure from established methodology to warrant reversal on procedural grounds.**[3]**

Had the matter actually proceeded to trial, the result would have hinged on the timing of the district court's ruling. If we assume that the trial evidence would have conformed to the proffer, the court may have been inclined to enter a judgment of acquittal following the Government's case-in-chief or after the defense had rested. Because the district court's judgment would have been based upon its determination that the evidence was insufficient to convict Terry, principles of double jeopardy would have barred any appeal by the Government. *See United States v. Mackins*, 32 F.3d 134, 137-38 (4th Cir. 1994). If the court had instead deferred its entry of judgment until after the jury had returned a guilty verdict, the Government would have been permitted to appeal Terry's acquittal inasmuch as the verdict could simply be reinstated without offending the Double Jeopardy Clause. *See* 18 U.S.C. § 3731; *United States v. Mitchell*, 177 F.3d 236, 238 (4th Cir. 1999) (citations omitted).

The district court here, however, entered its judgment prior to the attachment of jeopardy, rendering the situation analogous to post-verdict cases like *Mitchell*. That is, the Double Jeopardy Clause poses no impediment to the Government's appeal. We are therefore obliged to review de novo the district court's judgment of acquittal pursuant to Rule 29. *United States v. Wilson*, 118 F.3d 228, 234 (4th Cir. 1997) (citation omitted). In so doing, we are bound (as was the district

---

**[2]**Rule 12(b) permits only those defenses, objections, or requests "capable of determination without the trial of the general issue" to be raised and addressed by motion prior to trial. Fed. R. Crim. P. 12(b).

**[3]**I say "perhaps" because the Government may have waived its right to object to the unusual procedure employed by the district court by acceding to the court's demand for a proffer. Had the Government instead refused the invitation to stage a dress rehearsal, thereby triggering dismissal of the indictment, the procedural point would have been preserved.

court) to "view the evidence in the light most favorable to the government and inquire whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt." *Id.* In that vein, this case would pose the following question: "Could a reasonable jury, properly instructed, find as a fact that the First Baptist Church was used in interstate commerce, or in activity affecting interstate commerce?" The evidence related by the majority and stipulated to by the parties, *ante* at 3-4, is clearly sufficient to establish the interstate commerce element.

I agree with the majority that the most compelling fact in that regard is the evidence regarding the day care center operated within the church. But I would reach the same conclusion even had no day care center existed. Reviewed under the deferential Rule 29 standard, the additional evidence concerning the interstate commerce element would, standing alone, compel denial of a judgment of acquittal.

The majority, like the district court, treats the interstate commerce issue as being primarily a legal one, suitable for court determination in the first instance. I do not agree. The interstate commerce element of § 844(i) requires proof of a fact, and, in the ordinary course, it is subject to our review of the Government's evidence in accordance with Rule 29 — and not otherwise.

In all events, I am pleased to concur in the judgment.