**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 30, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SEAN MICHAEL GILLESPIE,

Defendant - Appellant.

No. 05-6292

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D. Ct. No. CR-04-94-C)**

---

Submitted on the briefs:[*]

Paul Antonio Lacy, Assistant Federal Public Defender, Office of the Federal Public Defender for the Western District of Oklahoma, Oklahoma City, Oklahoma, for Appellant.

John C. Richter, United States Attorney, and Scott L. Palk, Assistant United States Attorney, Office of the United States Attorney, Oklahoma City, Oklahoma, for Appellee.

---

Before **TACHA**, Chief Circuit Judge, **HOLLOWAY**, and **HARTZ**, Circuit Judges.

---

[*]After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

**TACHA**, Chief Circuit Judge.

———————————

After Defendant-Appellant Sean Michael Gillespie admitted to throwing a Molotov cocktail into Temple B'nai Israel located in Oklahoma City, a jury convicted him of using a destructive device during a violent crime in violation of 18 U.S.C. § 924(c)(1)(A); maliciously damaging a building used in interstate commerce or used in any activity affecting interstate commerce by means of an explosive in violation of 18 U.S.C. § 844(i); and possessing an unregistered destructive device in violation of 26 U.S.C. § 5861(d).  Mr. Gillespie now challenges both his conviction and sentence.  We have jurisdiction under 28 U.S.C. § 1291, and we AFFIRM.

## I.  BACKGROUND

The facts are undisputed.  Temple B'nai Israel is a Jewish synagogue in Oklahoma City.  Besides offering religious services and instruction, the Temple also houses a nonreligious preschool responsible for approximately sixty-five children.  The preschool charges for its services and has a yearly income of over $100,000.  In addition, Temple B'nai Israel maintains a gift shop that offers Judaica—such as Hanukkah items, Stars of David, and Seder plates—as well as children's videotapes, candy, and gift wrap for sale.  Ninety-five percent of the gift shop's approximately $33,000 worth of inventory is purchased from out-of-state vendors.

On April 1, 2004, Mr. Gillespie made a Molotov cocktail from a beer bottle and a rag, ignited it, and threw it at an outside door alcove at the Temple.  Mr. Gillespie

videotaped himself in the act, and his actions were also recorded on Temple B'nai Israel's video surveillance security system. Fortunately, no one was injured and damage to the Temple was minor, consisting mostly of some broken glass and charred walls.

Following an investigation, Mr. Gillespie was arrested and admitted to the crime. He was indicted on the three counts outlined above: (1) using a destructive device during a violent crime in violation of 18 U.S.C. § 924(c)(1)(A); (2) maliciously damaging a building used in interstate commerce or used in any activity affecting interstate commerce by means of an explosive in violation of 18 U.S.C. § 844(i); and (3) possessing an unregistered destructive device in violation of 26 U.S.C. § 5861(d). After the verdict but prior to sentencing, Mr. Gillespie wrote a letter to the Temple that was intercepted by correctional facility officials. The letter, which is set forth in full below, contained racially motivated epithets and claimed that Temple members falsely testified against him at his trial.

At sentencing, the District Court found that the letter provided a basis for a two-level offense enhancement for obstruction of justice under United States Sentencing Guidelines Manual ("U.S.S.G.") § 3C1.1. Mr. Gillespie was ultimately sentenced to 360 months' imprisonment as to the first count and 108 months' imprisonment as to the remaining two counts. Counts Two and Three were ordered to be served concurrently with each other and consecutively to Count One, which produced an aggregate sentence of 468 months.

On appeal, Mr. Gillespie argues: (1) insufficient evidence supports the jury's

conclusion that Temple B'nai Israel is a building used in or affecting an activity in interstate commerce within the meaning of 18 U.S.C. § 844(i); (2) the District Court erroneously applied the obstruction of justice enhancement; (3) his sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment; and (4) his sentence is unreasonable.

## II. DISCUSSION

A.    The evidence was sufficient to support the conclusion that Temple B'nai Israel is a building used in or affecting an activity in interstate commerce.

Whether the evidence presented at trial is sufficient to support a conviction is a matter we review de novo. *United States v. Smith*, 413 F.3d 1253, 1265 (10th Cir. 2005). Viewing the direct and circumstantial evidence in the light most favorable to the Government, we will uphold a conviction as supported by sufficient evidence so long as a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id.*

18 U.S.C. § 844(i) states that:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20 years . . . .

In *Jones v. United States*, the Supreme Court interpreted the phrase "used in interstate [] commerce or in any activity affecting interstate [] commerce." 529 U.S. 848 (2000). In that case, the defendant was convicted under 18 U.S.C. § 844(i) after he set fire to his Indiana home. The Government argued that although the home was not used

-4-

for any commercial purpose—such as when a private residence is rented to tenants, *see Russell v. United States*, 471 U.S. 858, 862 (1985)—the statutory term "affecting . . . commerce" in the statute signaled Congress' intent to invoke its full authority under the Commerce Clause. 529 U.S. at 854. Accordingly, the Government maintained that home was used in activities affecting interstate commerce in the following ways:

> First, the homeowner "used" the dwelling as collateral to obtain and secure a mortgage from an Oklahoma lender; the lender, in turn, "used" the property as security for the home loan. Second, the homeowner "used" the residence to obtain a casualty insurance policy from a Wisconsin insurer. That policy, the Government points out, safeguarded the interests of the homeowner and the mortgagee. Third, the homeowner "used" the dwelling to receive natural gas from sources outside Indiana.

*Id.* at 855.

The Court disagreed with the Government's expansive interpretation, holding instead that the words "used in" qualify the scope of § 844(i). Therefore, the Court determined that "[t]he proper inquiry . . . is into the function of the building itself, and then a determination of whether that function affects interstate commerce." *Id.* at 854 (quotation omitted). Applying that two-step approach, the Court held that "an owner-occupied residence not used for any commercial purpose does not qualify as property 'used in' commerce or commerce-affecting activity." *Id.* at 850–51. This Court has explained that:

> In reaching that conclusion, the Court employed a functional analysis to a building used solely as a private home, reasoning that it is not the common perception that the function of a private home is active employment for commercial purposes. It follows, the Court noted, that the delivery of natural gas to the house, insurance, and committing the home as security for

a mortgage loan are merely passive, passing or past connections to commerce, thus failing the "use" or "active" employment requirement of the statute.

*United States v. Grassie*, 237 F.3d 1199, 1207–08 (10th Cir. 2001).

After *Jones*, the prevailing view is that "[t]he fact that a building is a church, without more . . . does not bring it within the ambit of section 844(i)." *United States v. Rea*, 300 F.3d 952, 960 (8th Cir. 2002)  This is because "[a] church, like the owner-occupied residence considered in *Jones*, generally does not function in a manner that places it in any significant relationship with commerce, let alone interstate commerce." *United States v. Lamont*, 330 F.3d 1249, 1254 (9th Cir. 2003); *see also United States v. Davies*, 394 F.3d 182, 193 (3d Cir. 2005) ("[A] normal church is no more 'active[ly] used for commercial purposes' than was the residential house in *Jones*."); *United States v. Carr*, 271 F.3d 172, 179 (4th Cir. 2001) ("[U]se of a building as a church does not alone qualify it as being 'used in' interstate commerce."). Accordingly, the circuits have held that "a passive, past, or passing connection to interstate commerce," *United States v. Odom*, 252 F.3d 1289, 1296 (11th Cir. 2001), such as receiving donations from out-of-state donors, using Bibles purchased from an out-of state source, and indirectly contributing to an out-of-state organization, *see id.* at 1296–97; collecting money from members to purchase church supplies from out-of-state vendors and to fund out-of-state missions, *see Davies*, 394 F.3d at 186; and receiving gas from out-of-state pipelines, obtaining insurance from an out-of-state company, purchasing goods from out-of-state, and serving out-of-state worshipers, *see Lamont*, 330 F.3d at 1250, do not bring a church

-6-

within the scope of § 844(i).

This is not to say, however, that *no* place of worship engages in commercial functions sufficient to trigger the federal statute. *See Davies*, 394 F.3d at 193. For example, it has been suggested that "megachurches" offering banking, shopping, and barbershop services may be sufficiently unrelated to worship so as to warrant application of § 844(i) due to their commercial function. *See Lamont*, 330 F.3d at 1255. Similarly, this Court has upheld a conviction where the four churches at issue were the only Latter Day Saints churches in their four respective cities, and where the churches functioned in part like community centers, offering a wide range of social, recreational, and educational activities. *See Grassie*, 237 F.3d at 1203, 1208 (10th Cir. 2001). In *Grassie*, it was undisputed that the churches had "more activities in [their] buildings than most churches," *see id.* at 1204, and we concluded that the evidence at trial sufficiently supported the jury's verdict that the churches engaged in activities affecting interstate commerce. *See id.* at 1208.

Significant to the appeal at issue, the Fourth Circuit has held that housing a daycare center whose function is to provide child care services in exchange for payment singlehandedly transforms a place of worship into a building that is actively employed for commercial purposes. *See United States v. Terry*, 257 F.3d 366, 371 (4th Cir. 2001). The court explained that:

> [T]he daycare center ha[s] more than a passing or passive connection to interstate commerce. Instead, the daycare center [i]s actively engaged in commercial activity by participating in the market for childcare services.

-7-

> *See Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564,
> 586 n. 18 (1997) (noting a $16 billion "market in child day care services").
> The daycare center was not removed from or passively connected to
> commerce. Rather, the operation of the daycare center was itself a
> commercial activity.

*Id.* at 370.

Given this background, we turn back to the two-step approach set forth in *Jones*. Clearly, Temple B'nai Israel has multiple functions. *See United States v. Rayborn*, 312 F.3d 229, 233 (6th Cir. 2002) (stating that "[n]umerous court decisions support the idea that a building can have more than one function."); *Terry*, 257 F.3d at 370 (describing the function of a daycare center). Of course, the Temple operates as a place of worship and congregation. But it also maintains a preschool and a gift shop. Accordingly, Temple B'nai Israel has a religious function, but it also functions as a provider of childcare services and as a vendor of Jewish historical and literary materials.

As to the second step in the analysis—whether any of these three functions affects interstate commerce—we agree with the Fourth Circuit that the operation of a for-fee preschool within the Temple constitutes "active employment for commercial purposes" such that the function of the building affects interstate commerce. *See Terry*, 257 F.3d at 369–70. Our conclusion is bolstered by the maintenance of the gift shop, which participates in the market for Judaica. *Cf. Terry*, 257 F.3d at 370 (noting that the fact that the commercial activity takes place entirely within one state "is not dispositive" as to whether the activity affects interstate commerce). Therefore, we conclude that the evidence at trial relating to the preschool and the gift shop was sufficient to establish that

Temple B'nai Israel is a building used in or affecting an activity in interstate commerce within the meaning of 18 U.S.C. § 844(i).

Like the court in *Terry*, however, we emphasize that our holding is a limited one. Certainly, "[n]ot all buildings, and not all churches, come within the ambit of § 844(i)." *Id.* at 371. Because "Congress does not enjoy plenary power to usurp the states' traditional authority to denominate offenses like arson, larceny, burglary, vandalism, and other crimes against local property," the Supreme Court made clear in *Jones* that only a passing connection to interstate commerce—such as the receipt of energy from out-of-state sources—will not subject the building to the federal arson statute. *Id.* In contrast, however, we think it is clear that the presence of the preschool and the gift shop transformed the building in this case into one that was being actively employed for commercial purposes. Accordingly, Mr. Gillespie's conviction under § 844(i) must be affirmed.

B.      The District Court did not clearly err in finding Mr. Gillespie obstructed justice.

After Mr. Gillespie was convicted but prior to sentencing, he attempted to send a letter to Temple B'nai Israel. Jail administrators, however, intercepted the letter before it reached its intended recipient. The letter, which Mr. Gillespie addressed to "the Zionist scum," reads:

> This letter is to thank you for the lies in your testimony against me. You kikes know as well as I do, that I in no way affected interstate commerce in any way.
>
> Thru generations you Talmudic scum have tried to mire the image of the

beautiful Aryan people with lies, yet we resisted. We resisted because we knew the truth behind the veil of lies that you in your control of banking and media syndicates, have clouded the minds of our youth. You will pay for every fallen comrade, Aryan women and child you have harmed. Although I may not get to show you justice when the time for RAHOWA[1] dawns, know this, in my place will stand tall the scores of youthful Aryan warriors of tomorrow who will do battle that day. They will slay you, the Talmudic beast and all that follow or descend from that line. On that day of the rope, I will know justice against the kikes and mongrel hoardes that infest this once great Aryan society, will be done. I will be avenged by the sword in that great day, and a new dawn of Aryan yeomanry will arise to carry on the flame of justice and cast you down into the sea, to reclaim this land which was promised to my fathers of old!

Hail White Aryan Victory
6 million more!

Signed this day of my blood that vengeance will be done on the day of the sword.

Sean Gillespie. Signed in blood. Signed in honor.

U.S.S.G. § 3C1.1 mandates a two-level offense increase if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction . . ." Conduct meeting this description includes "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1 cmt. note 4(a). A district court's decision to enhance a sentence for obstruction of justice is reviewed only for clear error. *United States v. McCann*, 940 F.2d 1352, 1359–60 (10th Cir. 1991).

---

[1]RAHOWA is an acronym for "racial holy war."

In this case, the District Court determined that Mr. Gillespie's conduct was covered by § 3C1.1, finding that:

> Application Note 4(a), which talks about threatening or intimidating a witness, either directly or indirectly, during the pendency of proceedings constitutes obstruction of justice. As [the Government] points out, the sentencing was pending at the time this letter was written. Clearly, it was addressed to, it was a positive step taken toward communicating with the temple, and it was indirectly threatening and intimidating and could very well have had the result of keeping temple members from testifying at sentencing or providing restitution information or victim impact statements . . .

On appeal, Mr. Gillespie argues that the letter only refers to trial testimony establishing the interstate commerce element of Count Two and does not attempt to influence the sentencing process. Although Mr. Gillespie acknowledges that the language used and sentiments expressed in the letter would be offensive to the congregation, he maintains that there is no demand for action or inaction that would qualify as an attempt to obstruct his sentencing. We disagree. Mr. Gillespie wrote that "[y]ou will pay for every fallen comrade, Aryan women and child you have harmed" and that the temple would be shown "justice" during an impending holy war. We cannot conclude that the District Court clearly erred in finding such language to constitute an indirect threat on potential witnesses at Mr. Gillespie's sentencing.[2]

---

[2]Mr. Gillespie also makes a cursory argument that this issue was not considered by the jury and proven beyond a reasonable doubt in violation of his Sixth Amendment rights. *See United States v. Booker*, 543 U.S. 220, 244 (2005) (holding that under a mandatory Guidelines scheme, "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or

C.    Mr. Gillespie's 468-month sentence does not violate the Eighth Amendment.

Mr. Gillespie next argues that his aggregate sentence of imprisonment of 468 months (39 years) is disproportionate to the severity of his crimes and involves the unnecessary infliction of pain in violation of the Eighth Amendment.  We review this issue de novo.  *United States v. Angelos*, 433 F.3d 738, 750 (10th Cir. 2006).

"The Eighth Amendment contains a narrow proportionality principle that applies to noncapital sentences."  *Id.* (quotation marks and alterations omitted) (citing *Ewing v. California*, 538 U.S. 11, 20 (2003)).  Under this narrow principle, the Constitution does not require the crime and the sentence to be strictly proportional.  *Id.*  Instead, "it forbids only extreme sentences that are 'grossly disproportionate' to the crime."  *Ewing*, 538 U.S. at 20 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991)).  Generally, a sentence within the limits imposed by statute is neither excessive nor cruel and unusual under the Eighth Amendment.  *See United States v. Hughes*, 901 F.2d 830, 832 (10th Cir. 1990)

We recently analyzed the Supreme Court's treatment of the proportionality principle in *United States v. Angelos*, 433 F.3d 738 (10th Cir. 2006).  A review of the case law underscored the Court's statement that "'[t]he gross disproportionality principle reserves a constitutional violation for only the extraordinary case."  *Id.* at 751 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 77 (2003)).  Indeed, we emphasized that the Court has

proved to a jury beyond a reasonable doubt.").  Mr. Gillespie, however, was sentenced after *Booker* and the District Court treated the Guidelines as advisory.  Accordingly, there was no Sixth Amendment violation.  *See United States v. Visinaiz*, 428 F.3d 1300, 1316 (10th Cir. 2005).

-12-

only twice invalidated a sentence under the Eighth Amendment: once in 1910, when the defendant was sentenced to fifteen years in chains and hard labor for falsifying a public document; and most recently in 1983, when the defendant was sentenced to life without parole after committing six nonviolent felonies including writing a bad $100-dollar check. *Id.* at 750 (citing *Weems v. United States*, 217 U.S. 349 (1910) and *Solem v. Helm*, 463 U.S. 277 (1983)). By way of contrast, the Court has, for example, upheld a life sentence "for successive convictions of (1) fraudulent use of a credit card to obtain $80 worth of goods or services, (2) passing a forged check in the amount of $28.36, and (3) obtaining $120.75 by false pretenses," *id.* at 750 (citing *Rummel v. Estelle*, 445 U.S. 263, 285 (1980)), as well as two consecutive twenty-five-year to life sentences under a recidivist statute for two counts of petty theft, *id.* (citing *Lockyer*, 538 U.S. at 77). Given the rare application of the principle, we concluded that the defendant's sentence in *Angelos*—fifty-five years' imprisonment primarily for possessing a firearm during a drug trafficking crime in violation of 18 U.S.C. § 924(c)—must be upheld. We reasoned:

> Congress "could with reason conclude that the threat posed to the individual and society" by possessing firearms in connection with serious felonies, in particular drug-trafficking crimes, was "momentous enough to warrant the deterrence and retribution" of lengthy consecutive sentences, such as those imposed on Angelos in this case. In turn, that is enough to conclude that the sentences imposed on Angelos are not grossly disproportionate to his crimes.

*Id* at 752. (quoting *Harmelin*, 501 U.S. at 1003).

We reach the same conclusion today. To begin, Mr. Gillespie' sentence is clearly within the statutory limits. On Count One, Mr. Gillespie was sentenced to 360 months,

-13-

the statutory minimum. *See* 18 U.S.C. § 924(c)(1)(B)(ii). As to Count Two, a conviction under § 844(i) carries a mandatory minimum of 60 months and a statutory maximum of 240 months. *See* 18 U.S.C. § 844(i). Mr. Gillespie was sentenced to 108 months. On Count 3, Mr. Gillespie was again sentenced to 108 months, a sentence 12 months below the 120-month maximum. *See* 26 U.S.C. § 5871. By statutory mandate, the District Court ordered the sentences for Counts Two and Three to run consecutively to the sentence for Count One. *See* 18 U.S.C. § 924(c)(1)(D)(ii). Finally, the District Court exercised its discretion under 18 U.S.C. § 3584(a) and ordered Counts Two and Three to run concurrently with each other.

Nevertheless, Mr. Gillespie argues that his sentence is disproportionate to his crimes because his sentence is at the top of the applicable Guidelines range and because the arson only caused minor physical damage. We disagree. Mr. Gillespie was convicted of a violent act in which he employed an explosive device. As we concluded in *Angelos*, "Congress 'could with reason conclude that the threat posed to the individual and society'" of using an explosive in conjunction with a crime of violence and damaging a building used in or affecting interstate commerce is "momentous enough to warrant the deterrence and retribution" of lengthy and consecutive sentences notwithstanding the actual harm caused. *See Angelos*, 433 F.3d at 752 (quoting *Harmelin*, 501 U.S. at 1003). This is especially true where, as here, the perpetrator of the crime expresses dissatisfaction with its execution and regrets that more damage was not incurred. We also note that Mr. Gillespie has a history of violence, including violence against minority

-14-

groups. Indeed, in a number of telephone calls after his arrest, he boasted about the arson and spoke about his intent to start a racial holy war. Furthermore, a search of Mr. Gillespie's home produced a World War II encyclopedia, a machete, Nazi and SS flags, materials about white supremacy, instructions to make an explosive chemical mixture, a black ski mask, a black ski hood, camouflage shorts, and an inert hand grenade. In light of the foregoing, we conclude that this is not the "extraordinary case" that is shown to violate the Eighth Amendment. *See Lockyer*, 538 U.S. at 76 .

D.     Mr. Gillespie's sentence was reasonable.

We review sentences for reasonableness. *United States v. Kristl*, 437 F.3d 1050, 1053 (10th Cir. 2006). In conducting reasonableness review, we first consider whether the district court properly applied the Guidelines and then determine whether the sentence imposed is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a). *Id.* at 1055. A sentence that falls within the correctly calculated Guidelines range is presumptively reasonable. *Id.*

Here, Mr. Gillespie argues that his sentence is unreasonable because the District Court failed to adequately consider the factors set forth in 18 U.S.C. § 3553(a). A review of the record convinces us otherwise. The District Court specifically itemized a number of the § 3553(a) factors it considered.

Mr. Gillespie also contends, however, that his case should be remanded for resentencing because the District Court did not give reasons for the sentence imposed as

required by 18 U.S.C. § 3553(c).[3] *See also United States v. Sanchez-Juarez*, 446 F.3d 1109, 1117 (10th Cir. 2006) (holding that district courts must "provide sufficient reasons to allow meaningful appellate review of their discretionary sentencing decisions"). Again, Mr. Gillespie's contention is without merit. The District Court provided a sufficient summary of the basis for its selected sentence, referring to the impact on Temple members, Mr. Gillespie's violent conduct, and the relevant § 3553(a) factors. The District Court characterized the arson as an "act of violence that goes contrary to the principles on which this nation was founded" and concluded that a sentence at the top of the applicable Guidelines range was appropriate:

> This case requires that you be removed, in my opinion, from the public as long as is possible to protect the public from other violent and criminal acts on your part, and perhaps even to protect you from yourself. But not only for the protection of the public but also to promote respect for the law, to act as a deterrent to others who may be tempted to follow your path.

Accordingly, the District Court satisfied its obligation to give reasons for imposing Mr. Gillespie's particular sentence.

### III. CONCLUSION

The evidence at trial of Temple B'nai Israel's preschool and gift shop was sufficient to establish that the Temple is a building used in interstate commerce or used in any activity affecting interstate commerce within the meaning of 18 U.S.C. § 844(i). Further, the District Court did not clearly err in applying a two-level offense enhancement

---

[3] 18 U.S.C. § 3553(c) states that "[t]he court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence."

for obstruction of justice under U.S.S.G. § 3C1.1.  Finally, Mr. Gillespie's sentence does

not violate the Eighth Amendment and is reasonable.  We therefore AFFIRM.