**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-4299

UNITED STATES OF AMERICA,

        Plaintiff – Appellant,

    v.

JAMES WILLIAM HILL, III,

        Defendant – Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. John A. Gibney, Jr., District Judge. (3:16-cr-00009-JAG-1)

Argued: January 26, 2017                    Decided: August 18, 2017

Before SHEDD, AGEE, and WYNN, Circuit Judges.

Reversed and remanded by unpublished opinion. Judge Shedd wrote the opinion, in which Judge Agee joined. Judge Wynn wrote an opinion dissenting from the basis for the judgment.

**ARGUED:** Vikram Swaruup, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Elizabeth W. Hanes, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for Appellee. **ON BRIEF:** Vanita Gupta, Principal Deputy Assistant Attorney General, Thomas E. Chandler, Civil Rights Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Dana J. Boente, United States Attorney, Alexandria, Virginia, S. David Schiller, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for

Appellant.  Geremy C. Kamens, Federal Public Defender, Alexandria, Virginia, Mary E. Maguire, Patrick L. Bryant, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for Appellee.

––––––––––––

Unpublished opinions are not binding precedent in this circuit.

SHEDD, Circuit Judge:

James Hill, III was working at the Amazon Fulfillment Center in Chester, Virginia, when he allegedly assaulted C.T., a fellow employee, because of C.T.'s actual or perceived sexual orientation. Consequently, the United States indicted Hill for violating 18 U.S.C. § 249(a)(2). The district court dismissed the indictment, finding § 249(a)(2) unconstitutional as applied to Hill. For the following reasons, we reverse and remand.

I.

The indictment alleges that, on or about May 22, 2015, Hill willfully caused bodily injury to C.T. because of C.T.'s actual and perceived sexual orientation in violation of § 249(a)(2). Additionally, the indictment charges that "in connection with the offense, . . . Hill . . . interfered with commercial and other economic activity in which C.T. was engaged at the time of the conduct, and which offense otherwise affected interstate and foreign commerce." J.A. 5.[1]

Hill moved to dismiss the indictment, arguing that § 249(a)(2) is unconstitutional, both facially and as applied, as an invalid exercise of Congress' power under the Commerce Clause. In deciding the motion, the district court considered facts provided by the parties that were not included in the indictment. Specifically, the court considered asserted facts relating to the government's allegation that the assault affected interstate

---

[1] Section 249(a)(2) contains a jurisdictional element, which requires the government to establish an appropriate and sufficient connection to interstate commerce as an element of the offense.

commerce. Ultimately, the court dismissed the indictment and concluded that § 249(a)(2) exceeds Congress' legislative power as applied to Hill.[2]

## II.

We start by recognizing two important presumptions. First, although the district court considered the proffered facts as true in deciding Hill's pretrial motion, every defendant comes into court presumed to be innocent. *Taylor v. Kentucky*, 436 U.S. 478, 483 (1978). Additionally, every statute passed by Congress is presumed to be constitutional. *United States v. Morrison*, 529 U.S. 598, 607 (2000).

With these presumptions in mind, we review *de novo* the district court's dismissal of the indictment. *United States v. Brandon*, 298 F.3d 307, 310 (4th Cir. 2002). "[A] challenge to the sufficiency of the indictment . . . is ordinarily limited to the allegations contained in the indictment," and a court accepts the allegations as true. *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012). Under Rule 12, "[a] district court may dismiss an indictment . . . where there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial." *Id.* (citation and internal quotation marks omitted).

Although the parties have presented and briefed novel and complex issues of constitutional law, this appeal is more appropriately resolved on a threshold issue. On its

---

[2] Because the district court found the statute unconstitutional as applied, it did not rule on the facial challenge. *See Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 485 (1989) (finding that courts should normally decide as-applied challenges first). The parties have not briefed the issue of whether the statute is facially valid. Therefore, we also decline to decide this issue.

4

face, the indictment is legally sufficient and does not present an unconstitutional exercise of Congressional power. In an attempt to satisfy § 249(a)(2)'s jurisdictional element, the indictment specifically alleges that Hill's conduct had an effect on interstate commerce. Because this is an as-applied challenge, whether Hill's conduct sufficiently affects interstate commerce as to satisfy the constitutional limitations placed on Congress' Commerce Clause power may well depend on a consideration of facts, and because the facts proffered here may or may not be developed at trial, it is premature to determine the constitutional issues.[3] *See Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009) (en banc) (An as-applied challenge is "based on a developed factual record and the application of a statute to a specific person[.]"); *see also United States v. Terry*, 257 F.3d 366, 373 (4th Cir. 2001) (King, J., concurring) ("The interstate commerce element of [18 U.S.C.] § 844(i) requires proof of a fact, and, in the ordinary course, it is subject to our review of the Government's evidence in accordance with" a motion for a judgment of acquittal, not a pretrial motion.); *United States v. Matzkin*, 14 F.3d 1014, 1019 (4th Cir. 1994) ("An indictment that tracks the statutory language is ordinarily valid." (quoting *United States v. Fogel*, 901 F.2d 23, 25 (4th Cir. 1990))). Importantly, the complex constitutional issues presented may be avoided in this case, for

---

[3] At this stage, it is sufficient for the government to allege that the jurisdictional element is satisfied. Whether the government presents facts within the constitutional limitations of Congress' commerce power can only be answered after a proper factual context is established, e.g., at trial or in a formal stipulation, for such a determination.

instance, should the prosecution fail to result in a conviction.[4] *See Harmon v. Brucker*, 355 U.S. 579, 581 (1958) (Courts have a "duty to avoid deciding constitutional questions presented unless essential to proper disposition of a case."); *see also Bell Atl. Maryland, Inc. v. Prince George's Cty., Maryland*, 212 F.3d 863, 866 (4th Cir. 2000) (determining that the district court committed reversible error by deciding constitutional questions in advance of considering state law questions that may dispose of the case).

We acknowledge that a court may look beyond the indictment where "the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts." *United States v. Weaver*, 659 F.3d 353, 355 n.* (4th Cir. 2011). However, in *Weaver* the issue was one of statutory interpretation and was "purely legal." *Id.* Because the issue before this Court is an as-applied constitutional challenge, it involves questions of law and fact, and it is not prudent at this point to consider the extraneous facts, most of which were proffered by the government in an attempt to strengthen its case.[5] This determination is reinforced by the

---

[4] The government also presents an argument on appeal that was not directly before the district court: whether § 249(a)(2) is constitutional as applied under the Commerce Clause as a regulation of workplace conduct and discrimination. We believe the district court should consider this issue in the first instance.

[5] Additionally, the proffered facts fail to indicate the precise effect on interstate commerce that Hill's actions may or may not have had. For example, the facts relating to the items not shipped because of the assault are based on Amazon benchmarks, not the specific facts of this case. *See* J.A. 37. These factual uncertainties must be resolved before a court can properly rule on Hill's as-applied constitutional challenge, as the challenge involves determining whether Hill's conduct *substantially* affected interstate commerce.

presumptions of innocence and constitutionality. Facts outside of an indictment should not be used to conclusively decide whether an element of a criminal offense is satisfied during a pretrial motion, and a Congressional statute should not be overturned on an incomplete record. Thus, we conclude that the district court erred when it dismissed the indictment.

## III.

Accordingly, we reverse and remand with directions to reinstate the indictment.

*REVERSED AND REMANDED*

WYNN, Circuit Judge, dissenting from the basis for the judgment:

Defendant James Hill, III physically assaulted a coworker preparing packages for interstate shipment because Defendant believed him to be homosexual. Recognizing that the Virginia hate crime statute does not extend to cases involving sexual orientation, the Commonwealth's Attorney's Office in Chesterfield County referred this case to the U.S. Attorney's Office for the Eastern District of Virginia. Following the Attorney General's certification that prosecuting Defendant at the federal level is in the public interest and is necessary to secure substantial justice, the government indicted Defendant under the federal Hate Crimes Prevention Act of 2009 (the "Hate Crimes Act"), 18 U.S.C. § 249(a)(2). The district court dismissed the indictment on grounds that the Hate Crimes Act, as applied to Defendant's conduct, exceeded Congress's authority under the Commerce Clause.

On review to this Court, the majority opinion now ignores the district court's basis for dismissing the indictment and instead concludes that, because the government's indictment sets forth the charged offense in the language of the statute, it satisfies the specificity requirement imposed by Fifth and Sixth Amendments. But that conclusion answers *a question that Defendant never raised and the district court, unsurprisingly, never addressed.* In so doing, the majority opinion elides the question that Defendant and the government properly placed before the district court and this Court: Whether Congress can enact a statute, pursuant to its authority to regulate interstate commerce, proscribing the physical assault of a victim whose job involves packing products for interstate sale and shipment and who is doing that job at the time of the assault?

8

If that important question is properly answered, as it should be, then it must be concluded that such a statute easily falls under Congress's broad authority to regulate interstate commerce. The Supreme Court has consistently held that Congress has the authority to regulate criminal conduct that interferes with ongoing commercial activity subject to congressional regulation. *See, e.g.*, *Taylor v. United States*, 136 S. Ct. 2074 (2016). And the Commerce Clause assuredly empowers Congress to regulate the sale and shipment of goods across state lines. *See* U.S. Const. art. I, § 8, cl. 3; *United States v. Lopez*, 514 U.S. 549, 558 (1995). Therefore, Congress may proscribe conduct—including violent assaults on individuals engaged in interstate commercial activity—that interferes with that activity.

Cavalierly, the majority ducks the only issue in this case and instead decides an issue that was neither presented by the parties nor addressed by the district court. The only issue in this case is one of first impression and of great importance—it was addressed by the district court and has now been placed squarely before us by the parties. We should not, on our own volition, create a basis for avoiding it.

## I.

The facts relevant to whether the government's prosecution of Defendant complies with the Commerce Clause are not in dispute. At the time of the assault, Defendant and the victim—referred to by the parties as "C.T."—were coworkers at an Amazon Fulfillment Center in Chester, Virginia. Defendant worked as a "re-binner" at the Amazon facility and was responsible for "moving items from various bins on [a] conveyor belt to [a] cubbyhole for aggregation prior to packaging." J.A. 37. C.T. was

9

employed as a "packer," which required him to take items from the cubbyholes and load them into boxes for shipment.

At approximately 7:00 p.m. on May 22, 2015, C.T. was retrieving items to load into a box when Defendant approached C.T. from behind and—without provocation or warning—repeatedly punched him in the face. As a result of the attack, C.T. sustained numerous injuries, including a bloody nose, abrasions on his nose and cheeks, and lacerations and bruising around his left eye. Following the incident, neither Defendant nor C.T. returned to their work stations for the remainder of their ten-hour shifts. Their absences affected more than 5,500 items, which were either not shipped or not "re-binned" during that time.

Later that evening, Defendant provided a statement to the Amazon Human Resources and Loss Prevention staff before agreeing to a voluntary interview by the Chesterfield County Police Department. In each instance, Defendant explained that he "felt disrespected by C.T. because C.T. was a homosexual; that he does not like homosexuals; and that C.T. deserved to be punched because he was a homosexual." J.A. 36. Defendant offered no other explanation for the assault.

About six months after the Attorney General certified that prosecuting Defendant at the federal level "is in the public interest and is necessary to secure substantial justice," J.A. 33, a federal grand jury returned the one-count indictment now before us. The indictment alleges that Defendant physically assaulted C.T. because of C.T.'s actual or perceived sexual orientation. The indictment further alleges that, in doing so, Defendant "interfered with commercial and other economic activity in which C.T. was engaged at

10

the time of the conduct" and that the assault "otherwise affected interstate and foreign commerce." J.A. 5.

Defendant moved to dismiss the indictment on several grounds, including that the Hate Crimes Act, as applied to his conduct, exceeded Congress's authority under the Commerce Clause. The district court agreed with Defendant's as-applied challenge under the Commerce Clause and dismissed the indictment. *United States v. Hill*, 182 F. Supp. 3d 546, 555–56 (E.D. Va. 2016). The government timely appealed.

II.

Before analyzing whether Defendant's prosecution is permissible under the Commerce Clause, it is first necessary to dispose of the majority opinion's contention that addressing that question prior to trial would improperly infringe upon Defendant's presumption of innocence and right to have every element of the charged offense found beyond a reasonable doubt by an appropriate factfinder.[1] *See ante* at 6–7.

It is a fundamental precept of our criminal justice system that the accused enjoys a presumption of innocence at all stages of the government's prosecution. *Estelle v. Williams*, 425 U.S. 501, 503 (1976). Therefore, we may not, under the auspices of

_____

[1] Notably, the government has not argued that the district court erred in reaching the merits of Defendant's motion to dismiss the indictment on grounds that doing so would infringe upon Defendant's Fifth and Sixth Amendment rights. Generally, we may not reverse a district court's judgment based on an argument not raised by an appellant, except when failing to do so would result in a "miscarriage of justice." *A Helping Hand, LLC v. Baltimore Cty., Md.*, 515 F.3d 356, 369 (4th Cir. 2008) ("It is a well settled rule that contentions not raised in the argument section of the opening brief are abandoned." (internal quotation and alterations omitted)). No miscarriage of justice results from declining to revive Defendant's prosecution based on an argument not raised by the government, nor has the government argued as much.

11

disposing of a pretrial motion to dismiss an indictment, resolve factual disputes that must instead be decided at trial. *See United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012). Likewise, the Supreme Court has long made clear that the Constitution provides that a criminal defendant may be convicted only if every element of a charged offense is found beyond a reasonable doubt by a proper factfinder. *See United States v. Gaudin*, 515 U.S. 506, 522–23 (1995); *see also United States v. Ramirez-Castillo*, 748 F.3d 205, 212–13 (4th Cir. 2014) (relying on *Gaudin* and explaining that the jury's role is to determine the facts as to each element and apply the law as instructed by the judge to those facts).

But resolving the only issue properly before us—whether the government's prosecution of Defendant complies with the Commerce Clause—does not tread upon Defendant's constitutional rights. To be sure, we must closely scrutinize any judicial decision that has the potential to infringe on a criminal defendant's rights under the Constitution. Among those rights, however, Defendant—like any other criminal defendant—has a right to defend the charges against him in the manner he sees fit. *Cf. Faretta v. California*, 422 U.S. 806, 818–21 (1975) (describing the constitutional foundations of a criminal defendant's right to self-representation); *see also Indiana v. Edwards*, 554 U.S. 164, 184 (2008) (Scalia, J., dissenting) ("What the Constitution requires is that a defendant be given the right to challenge the State's case against him using the arguments *he* sees fit." (emphasis in original)). Here, rather than subjecting himself to the time and expense of trial (or, instead, pleading guilty and forgoing the very rights the majority seeks to preserve), Defendant elected to lodge a pretrial challenge to his prosecution based on the undisputed facts giving rise to his indictment.

12

Significantly, Federal Rule of Criminal Procedure 12(b)(1) provides that a defendant "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Under Rule 12(b)(1), "a district court may consider a pretrial motion to dismiss an indictment where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts." *United States v. Weaver*, 659 F.3d 353, 355 n.* (4th Cir. 2011) (interpreting a previous version of Rule 12(b)(1), which has since been reorganized without substantive modification). Just the same, this Court and other courts routinely decide constitutional challenges to the application of criminal statutes raised in pretrial motions to dismiss an indictment. *See, e.g.*, *United States v. Nash*, 627 F.3d 693, 696–97 (8th Cir. 2010); *United States v. Terry*, 257 F.3d 366, 367–68 (4th Cir. 2001); *United States v. Wilks*, 58 F.3d 1518, 1519–22 (10th Cir. 1995); *see also* 42 C.J.S. *Indictments* § 237 (2017) ("Typically, constitutional challenges to the charging statute can be raised during pretrial motions, specifically, in a motion to dismiss the indictment . . . .").

Here, in moving to dismiss the indictment, Defendant recounted the undisputed facts giving rise to the charged offense and argued that the Hate Crimes Act "is unconstitutional as applied to [those] undisputed facts." J.A. 23. The government did not dispute the district court's authority to resolve Defendant's motion, and the relevant facts proffered by the government in its response to the motion to dismiss the indictment mirror those recounted in Defendant's motion. In accordance with the parties' filings, the district court found that "[t]he parties do not dispute the facts material to the court's

13

decision on the constitutionality of the [Hate Crimes Act] as applied to Hill," and therefore concluded that Defendant's motion to dismiss was procedurally appropriate under Rule 12(b)(1). *See Hill*, 182 F. Supp. 3d at 548 n.1. We have held that a district court may resolve a defendant's motion to dismiss an indictment in precisely these circumstances. *Weaver*, 659 F.3d at 355 & n.* (resolving pretrial motion to dismiss indictment raising question of statutory interpretation). Frankly, "[t]here is no good reason to force the court to incur the expense and delay of a trial that would inevitably lead to the same outcome as its pretrial ruling." *Id.* at 355 n.*.

Nevertheless, the majority relies upon a *concurring* opinion's assertion that, "in the ordinary course," the question of whether a defendant's alleged conduct satisfies a statute's interstate commerce element is better resolved in connection with a motion for a judgment of acquittal, and not a pretrial motion to dismiss. *See Terry*, 257 F.3d at 373 (King, J., concurring); *see also ante* at 5. But a concurring opinion has no binding effect on the law in this circuit for "[i]t goes without saying that the majority opinion, not the gloss that the concurrence seeks to place thereon, is controlling." *Dababnah v. Keller-Burnside*, 208 F.3d 467, 471 n.3 (4th Cir. 2000); *see Maryland v. Wilson*, 519 U.S. 408, 412–13 (1997) (observing that a statement in a concurrence does not "constitute[] binding precedent"). And even if we did accord concurring opinions some degree of precedential value, that concurrence did not embrace an absolute bar on the resolution of as-applied Commerce Clause challenges through a pretrial motion to dismiss an indictment. Rather, it suggested that such challenges should be resolved "in the ordinary course" through a motion for a judgment of acquittal. *See Terry*, 257 F.3d at 373 (King, J., concurring).

14

What the majority should rely upon is the *Terry* majority opinion, which unquestionably is binding on this panel and unambiguously held that, in circumstances substantively indistinguishable from the instant case, district courts should resolve an as-applied constitutional challenge raised in a motion to dismiss an indictment. *Terry* involved an as-applied challenge to the federal arson statute, 18 U.S.C. § 844, by two defendants charged with starting two fires in a North Carolina church. 257 F.3d at 367. Like here, the defendants moved before trial to dismiss the government's indictment on the ground that application of the federal statute to their alleged conduct would exceed Congress's authority under the Commerce Clause. *See id.* And like here, the district court convened a pretrial hearing to consider the defendants' motion, at which the government proffered additional evidence purporting to show a nexus between the church and interstate commerce. *Id.* at 367–68. Also like here, the government did not dispute the district court's authority to resolve the defendants' pretrial motion to dismiss the indictment. *See id.*

Contrary to the *Terry* concurring opinion, the *Terry* majority opinion addressed the merits of the defendants' Commerce Clause challenge. In reaching the merits, the *Terry* majority opinion explained that when resolving an as-applied constitutional challenge raised in a motion to dismiss an indictment, the proper course is to "assume that all facts *proffered* by the government are true," even when such facts are not set forth in the indictment. *See id.* at 367 (emphasis added). To that end, in considering whether the burned church demonstrated a sufficient relationship to interstate commerce to support a federal prosecution, the *Terry* majority opinion relied on evidence proffered by the

15

government in the pretrial hearing. *See id.* at 368–71. This evidence, which was not set out in the underlying indictment, included allegations regarding the operation of a daycare center on the church's premises that was damaged in the fire, as well as specific representations regarding the center's fees, employment practices, and hours of operation. *See id.* at 369–70. Taking these allegations as true, the Court held that the church facilities were "actively employed in commercial activities," such that the government could pursue its federal charges against the defendants without running afoul of the Constitution. *See id.* at 371.

The district court's resolution of Defendant's as-applied Commerce Clause challenge is therefore entirely consistent with the approach taken by this Court in *Terry*. With this in mind, to resolve the instant appeal, we must consider whether, taking as true all of the factual allegations proffered by the government before the district court, the indictment states an offense under the Hate Crimes Act. *See id.* at 367–68.

III.

Having concluded that we are bound to consider the thrust of Defendant's constitutional challenge to his prosecution, I further conclude that the undisputed facts— that Defendant assaulted C.T. at his place of employment while C.T. was packing boxes for interstate shipment—establish a sufficient nexus between Defendant's conduct and interstate commerce to support a conviction under the Hate Crimes Act.

A.

It "is a well-worn yet ever-vital maxim that the Constitution creates a Federal Government of enumerated powers." *United States v. Bollinger*, 798 F.3d 201, 208 (4th

16

Cir. 2015) (alteration and internal quotation marks omitted) (quoting *Lopez*, 514 U.S. at 552). Among these enumerated powers, the Commerce Clause permits Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3.

Under the Supreme Court's modern Commerce Clause jurisprudence, "Congress is limited to regulating three broad categories of interstate activity: (1) 'the use of the channels of interstate commerce,' (2) 'the instrumentalities of interstate commerce, or persons or things in interstate commerce,' and (3) 'activities that substantially affect interstate commerce.'" *Bollinger*, 798 F.3d at 209 (quoting *Lopez*, 514 U.S. at 558–59). In limiting federal authority to these categories, the Supreme Court has consistently invoked themes of federalism and its view that "Congress's interstate power must be 'read carefully to avoid creating a general federal authority akin to the police power.'" *Id.* at 211 (quoting *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2578 (2012)).

Congress paid close attention to the scope of its authority under the Commerce Clause when it enacted the Hate Crimes Act, which was designed to strengthen federal efforts to combat violent hate crimes—crimes targeting victims based on certain enumerated characteristics. National Defense Authorization Act for Fiscal Year 2010, Pub. L. 111-84, §§ 4701–13, 123 Stat. 2190, 2835–44 (2009). The statute's substantive provisions are preceded by congressional findings regarding the prevalence and impact of violent hate crimes throughout the country, as well as Congress's desire to assist state and local efforts to combat such violence. *Id.* § 4702. Distinguishing hate crimes from other violent crimes—which, Congress emphasized, States continue to be responsible for

17

prosecuting—Congress concluded that violent hate crimes "substantially affect[] interstate commerce in many ways." *Id.* § 4702(6). Among these effects, Congress explained that:

(A)　The movement of members of targeted groups is impeded, and members of such groups are forced to move across State lines to escape the incidence or risk of such violence.

(B)　Members of targeted groups are prevented from purchasing goods and services, obtaining or sustaining employment, or participating in other commercial activity.

(C)　Perpetrators cross State lines to commit such violence.

(D)　Channels, facilities, and instrumentalities of interstate commerce are used to facilitate the commission of such violence.

(E)　Such violence is committed using articles that have traveled in interstate commerce.

*Id.* As such, Congress concluded that "[f]ederal jurisdiction over certain violent crimes motivated by bias enables Federal, State, and local authorities to work together as partners in the investigation and prosecution of such crimes." *Id.* § 4702(9).

To achieve this state-federal collaboration, the Hate Crimes Act created a variety of federal criminal offenses arising out of violent acts undertaken with animus towards various actual or perceived personal characteristics of the victim. Most importantly, for present purposes, the statute provides that any person who, under certain specified circumstances, "willfully causes bodily injury to any person . . . because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person . . . shall be imprisoned not more than 10 years." 18 U.S.C. § 249(a)(2)(A)(i). Such conduct may be prosecuted under the statute only where it, *inter*

18

*alia*, "interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct" or "otherwise affects interstate or foreign commerce." *Id.* § 249(a)(2)(B)(iv).

In adopting the Hate Crimes Act, Congress sought to "invoke the full scope of [its] Commerce Clause power, and to ensure that hate crimes prosecutions brought under [§ 249(a)(2) would] not be mired in constitutional litigation." H.R. Rep. No. 111–86, at 15 (2009). Aware of the relevant authority addressing the extent of that power, the bill's authors sought to ensure that conduct criminalized under the statute would have "the requisite connection to interstate commerce." *See id.* ("To avoid constitutional concerns arising from the decision in *United States v. Lopez*, 514 U.S. 549 (1995), the bill requires that the Government prove beyond a reasonable doubt, as an element of the offense, a nexus to interstate commerce in every prosecution brought under one of the newly created categories of 18 U.S.C. 249(a)(2)."); *see also id.* (explaining that the interstate commerce element was "drawn to comport with Supreme Court guidance in *Lopez* and *U.S. v. Morrison*, 529 U.S. 598 (2000)"); *id.* (explaining that "[t]he interstate commerce nexus required by the bill is analogous to that required in other Federal criminal statutes," such as the Church Arson Prevention Act of 1996, 18 U.S.C. § 247).

B.

Against this legal backdrop, the government contends that the district court erred in holding that Defendant's assault of C.T. lacked sufficient connection to interstate commerce to support Defendant's prosecution under the Hate Crimes Act. Specifically, the government argues that the assault, which occurred while C.T. was actively working

19

as an Amazon employee, "interfere[d] with commercial or other economic activity in which [C.T. was] engaged at the time of the [assault]," 18 U.S.C. § 249(a)(2)(B)(iv)(I), and, thus, Defendant is subject to prosecution consistent with Congress's Commerce Clause authority.[2]

Whether the Hate Crimes Act may be constitutionally applied to an unarmed assault at a victim's place of work appears to be an issue of first impression in this Circuit or any other. *See, e.g.*, *United States v. Miller*, 767 F.3d 585, 589, 602 (6th Cir. 2014) (reversing Hate Crimes Act convictions due to erroneous jury instructions and declining to consider as-applied challenge to prosecution for a series of assaults on Amish men); *United States v. Mason*, 993 F. Supp. 2d 1308, 1317 (D. Or. 2014) (rejecting as-applied challenge involving assault with a weapon, but noting that "it might be unconstitutional to apply the [Hate Crimes Act] . . . if the weapon [the defendant] used had not traveled in interstate or foreign commerce, or if he had not used any weapon at all"); *United States v. Jenkins*, 909 F. Supp. 2d 758, 764, 773 (E.D. Ky. 2012) (concluding, albeit reluctantly, that the Hate Crimes Act is constitutional as applied to defendants who kidnapped and transported victim along federal highway).

Despite this lack of precedential guidance, the parties agree that Defendant's prosecution is constitutional, if at all, as an effort to regulate "activities that substantially

---

[2] Because I conclude that the undisputed facts are sufficient to establish that Defendant's conduct "interfere[d] with commercial or other economic activity in which the victim is engaged at the time of the conduct," I need not—and thus do not—reach the question of whether Defendant's conduct is susceptible to federal prosecution as "otherwise affect[ing] interstate or foreign commerce." 18 U.S.C. § 249(a)(2)(B)(iv).

affect interstate commerce." *Bollinger*, 798 F.3d at 209 (internal quotation marks omitted). Before the district court and this Court, the government argued that, by "interfering" with C.T.'s packaging and shipping of products, Defendant's conduct "substantially affect[ed] interstate commerce," as that phrase has been interpreted in decisions upholding prosecutions for robbery under the Hobbs Act, 18 U.S.C. § 1951(a), and arson under 18 U.S.C. § 844(i). I agree.

The Supreme Court addressed a Commerce Clause challenge to the Hobbs Act in *Taylor v. United States*, 136 S. Ct. 2074 (2016). Similar to the Hate Crimes Act, the Hobbs Act provides for federal penalties for robbery and extortion that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce." 18 U.S.C. § 1951(a). *Taylor* involved the prosecution of a defendant who attempted to steal marijuana and cash from two drug dealers. 136 S. Ct. at 2078–79. Upholding the defendant's conviction, a near-unanimous majority characterized its holding as "straightforward and dictated by [the Court's] precedent." *Id.* at 2077. Specifically, the Court explained that Congress's recognized authority to regulate purely intrastate production, possession, and sale of marijuana—due to the aggregate effect of these activities on interstate commerce—compelled the conclusion that Congress may likewise regulate conduct that affects such activities. *See id.* at 2080 ("In this case, the activity at issue, the sale of marijuana, is unquestionably an economic activity. . . . It therefore follows as a simple matter of logic that a robber who affects or attempts to affect even the intrastate sale of marijuana . . . affects or attempts to affect commerce over which the United States has jurisdiction."). *Taylor* therefore establishes

21

that, pursuant to its power under the Commerce Clause, Congress may proscribe violent conduct when such conduct interferes with or otherwise affects commerce over which Congress has jurisdiction. *See id.* Importantly, Congress may regulate violent conduct interfering with interstate commerce even when the conduct itself has a "minimal" effect on such commerce. *Id.* at 2079, 2081.

Much the same, the federal arson statute prohibits setting fire to "any . . . property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." 18 U.S.C. § 844(i). In *Russell v. United States*, 471 U.S. 858 (1985), the Supreme Court unanimously held that the statute may be applied to prosecute a defendant who set fire to a two-unit apartment building. 471 U.S. at 858–62. In reaching this conclusion, the Court noted that the statute's broad phrasing—covering any property used in an activity affecting interstate commerce—was intended to "protect all business property, as well as some additional property that might not fit that description." *Id.* at 862. The rental of the property at issue in that case was "unquestionably" covered by the statute, the Court explained, because "the local rental of an apartment unit is merely an element of a much broader commercial market in rental properties[, and t]he congressional power to regulate the class of activities that constitute the rental market for real estate includes the power to regulate individual activity within that class." *Id.* As in *Taylor*, the Court thus indicated that Congress may regulate crime when such crime interferes with or otherwise affects commerce subject to congressional regulation. *See United States v. Garcia*, 768 F.3d 822, 829–30 (9th Cir. 2014).

After *Lopez*, and during the same term that the Supreme Court decided *Morrison*, the Court again addressed the constitutional sweep of the federal arson statute in *Jones v. United States*, 529 U.S. 848 (2000). There, the Supreme Court construed the statute to permit the government to pursue a prosecution only where the defendant's conduct affects "property currently used in commerce or in an activity affecting commerce." 529 U.S. at 859. In so doing, the Court recognized the potential constitutional concerns that may have arisen had Congress sought to "render . . . traditionally local criminal conduct . . . a matter for federal enforcement." *Id.* at 858 (internal quotation marks omitted). To ameliorate these concerns and ensure that prosecutions under the statute involve conduct bearing a constitutionally adequate connection to interstate commerce, the Court required the government to show that a subject building was used in commerce or in an activity affecting commerce at the time of its destruction. *Id.* at 858–59. As in *Russell*, the Court's analysis makes plain that, where a defendant's conduct directly interferes with or otherwise affects commerce subject to congressional regulation, that conduct may be federally regulated under the Commerce Clause. To wit, as noted, this Court has since held that Section 844(i) was constitutional as applied to the prosecution of defendants who set fire to a church that provided daycare services. *See Terry*, 257 F.3d at 369–71.

I agree with the government that, under these precedents, Defendant's charged conduct is subject to congressional regulation under the Commerce Clause. In particular, the parties do not dispute that Congress enjoys the authority to regulate the underlying commercial activity C.T. was engaged in at the time of the assault (*i.e.*, preparing goods

23

for sale and shipment across state lines). And taking the government's proffered evidence as true—as we must, *see id.* at 367—Defendant's physical assault of C.T. directly interfered with and thwarted the packaging, shipment, and sale of over 5,500 items across state lines. Under current Supreme Court precedent, it follows that Congress has the authority to proscribe Defendant's violent conduct. That is precisely what Congress did in enacting the Hate Crimes Act, thereby making it unlawful for a defendant to inflict bodily injury in a manner that "interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct." 18 U.S.C. § 249(a)(2)(B)(iv)(I).

Seeking to distinguish the Hobbs Act and arson cases, Defendant argues that robbery and arson are "economic endeavors" that have "a direct connection with commerce separate from their jurisdictional elements." Appellee's Br. at 18–19. By contrast, in Defendant's view, the Hate Crimes Act "does not prohibit violence related to an economic act, such as assaults done in order to further an economic interest," and therefore exceeds Congress's authority under the Commerce Clause. Appellee's Br. at 14.

Defendant's argument has some superficial appeal. *See, e.g., United States v. Walker*, 657 F.3d 160, 179 (3d Cir. 2011) ("Although drawing the line between 'economic' and 'non-economic' activities may sometimes be difficult, property crimes like robbery and extortion are—unlike . . . gender-motivated violence—indisputably 'economic' under our post-*Lopez* precedents."). However, the Supreme Court has recognized that the economic or non-economic nature of proscribed conduct turns on

24

whether the conduct can be shown to *affect* economic activity subject to congressional regulation—and therefore interstate commerce—and not whether the perpetrator of the conduct was *motivated* by economic interest. *See, e.g.*, *Jones*, 529 U.S. at 854 (requiring courts to consider the commercial function, if any, of destroyed property to determine whether its destruction may be prosecuted under the federal arson statute).

Indeed, we have consistently rejected the argument that a defendant must intend for his criminal conduct to affect interstate commerce for such conduct to be susceptible to congressional regulation under the Commerce Clause. *See, e.g.*, *United States v. Williams*, 342 F.3d 350, 354 (4th Cir. 2003) (holding that the Hobbs Act "does not require proof that a defendant intended to affect commerce or that the effect on commerce was certain; it is enough that such an effect was the natural, probable consequence of the defendant's actions"). And this Court and other circuits have concluded that federal arson statutes may be applied against defendants who set fire to property used in interstate commerce, notwithstanding that such defendants were motivated by purely personal reasons, and not any economic interest. *See, e.g.*, *United States v. Ballinger*, 395 F.3d 1218, 1221–23 (11th Cir. 2005) (en banc) (upholding conviction of defendant, a self-proclaimed practicing "Luciferian," who set fire to numerous churches because of his "hostility toward organized Christianity"); *United States v. Cristobal*, 293 F.3d 134, 137, 144–46 (4th Cir. 2002) (upholding federal arson conviction where defendant targeted victims based on suspicions regarding wife's philandering and planted car bombs on vehicles driven by victims and owned by the victims' employers); *United States v. Grassie*, 237 F.3d 1199, 1205, 1211 (10th Cir.

25

2001) (upholding conviction of defendant who set fire to truck used to haul fruits of annual harvest, even though defendant set fire to truck because victim's mother had broken off relationship with defendant).

In this sense, the distinction between purely economic property crimes and purely non-economic violent crimes is not as clear as Defendant suggests. For example, we have held that conduct that does not directly implicate commerce or property may be viewed as economic when a connection between the conduct and interstate commerce is evident. *See, e.g.*, *Gibbs v. Babbitt*, 214 F.3d 483, 492 (4th Cir. 2000) (contrasting the hunting of red wolves with "gender-motivated violence," but holding that such hunting is "in a meaningful sense economic activity" because wolves pose a threat to livestock and are a draw for interstate tourism). Along similar lines, although the *Lopez* Court described mere firearm possession as "in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce," 514 U.S. at 567, we—along with every other circuit to have considered the issue—have upheld federal statutes criminalizing such possession when the firearm in question has moved in interstate commerce, *see, e.g.*, *United States v. Gallimore*, 247 F.3d 134, 138 (4th Cir. 2001); *see also United States v. Nathan*, 202 F.3d 230, 234 (4th Cir. 2000) (explaining that the jurisdictional element "requires a case-by-case inquiry into the connection with commerce"). In light of these holdings, Defendant's assertion that "[p]unching someone in the face has nothing to do with commerce," Appellee's Br. at 11, is inapposite. It is not the violent *act* itself that triggers Congress's regulatory authority

26

under the Commerce Clause, but the *effect* of that act on interstate commerce that renders it susceptible to federal regulation.[3]

The firm distinction Defendant would have us draw between economic and non-economic crimes would lead to any number of anomalous results. For example, under the standard advanced by Defendant, the Commerce Clause would not permit federal authorities to prosecute an individual who—like Defendant—attacked a coworker actively engaged in the packing and shipment of a product across state lines. But, if the shipped product was a firearm and the recipient sat on a park bench within 1,000 feet of a public school while in possession of that firearm—be it the following day or seventeen years later—the recipient's conduct would have a sufficient effect on interstate commerce to support the recipient's conviction under the Commerce Clause. *See United States v. Crump*, 120 F.3d 462, 466 n.2 (4th Cir. 1997); *see also United States v. Roseby*, 454 F.

---

[3] Although Defendant does not dispute the government's estimate of the number of packages impacted by the assault, the majority opinion suggests that, before resolving Defendant's Commerce Clause challenge, further factual development is required to definitively determine the precise number of Amazon shipments affected by Defendant's assault of C.T. *Ante* at 6 n.5. But the Supreme Court has made clear that, for purposes of assessing an as-applied challenge under the Commerce Clause, "it makes no difference . . . that any actual or threatened effect on commerce in a particular case is minimal." *Taylor*, 136 S. Ct. at 2081. Rather, "[w]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class." *Perez v. United States*, 402 U.S. 146, 154 (1971) (quoting *Maryland v. Wirtz*, 392 U.S. 183, 193 (1968)). Thus, the Supreme Court has rejected Commerce Clause challenges when the charged conduct interfered with even a miniscule amount of interstate commerce. *Taylor*, 136 S. Ct. at 2078, 2081–82 (affirming Hobbs Act conviction based on attempted drug robberies that netted only jewelry, $40, three cell phones, and a single marijuana cigarette).

Accordingly, as long as Defendant's assault of C.T. affected some shipments, the exact number of shipments affected by his assault has no bearing on the resolution of Defendant's Commerce Clause challenge.

App'x 186, 188 (4th Cir. 2011). It can hardly be gainsaid that the passive possession of a firearm outside a school bears any more obvious a relationship to interstate commerce than the *actual shipment* of the same firearm across state lines.

Likewise, were Defendant's position correct that the Commerce Clause permits Congress to regulate only crimes against property, and not crimes against persons, then Congress could hold criminally accountable individuals who damage real property owned by a business, *see Terry*, 257 F.3d at 369–71, but not individuals who assault an employee actively working for that business. Yet there is no constitutional or logical basis to conclude that the Commerce Clause authorizes Congress to regulate interference with one factor of production (capital, in the form of real property), but not another (labor). On the contrary, the Supreme Court's longstanding recognition that Congress may pervasively regulate the labor market and the terms and conditions of employment indicates that Congress may proscribe conduct that interferes with labor as well as capital. *See, e.g.*, *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30–32 (1937) (rejecting Commerce Clause challenge to the National Labor Relations Act).[4]

Defendant further argues—and the district court held—that the Supreme Court's decisions in *Lopez* and *Morrison* demonstrate that Defendant's physical assault of C.T. does not fall under Congress's authority to regulate "activities that substantially affect

---

[4] The fallacy underlying this distinction is even more evident in light of the rising tide of automation throughout much of the American economy. Under the rule proposed by Defendant, Congress would have less authority to protect flesh-and-blood workers employed in interstate commerce than machines performing the very same tasks as those workers. I see no constitutional basis for embracing such a rule, and Defendant has pointed to none.

interstate commerce." *See Hill*, 182 F. Supp. 3d at 552–55.[5] Again, however, the government has the better of the argument on this score.

In *Lopez*, the Supreme Court considered a challenge to the Gun-Free School Zones Act, in which Congress established a federal criminal offense prohibiting possession of a firearm near a school. 514 U.S. at 551. There, the defendant, a 12th-grade student, was charged with carrying a concealed .38-caliber handgun on school property. *Id.* The Supreme Court held that the statute exceeded Congress's authority under the Commerce Clause because it had "nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Id.* at 561. The Court further emphasized that the statute lacked an interstate-commerce jurisdictional element and explained that it could not be "sustained under . . . cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Id.* Finally, the Court rejected the government's argument that the statute was constitutional because possession of firearms in school zones may lead to violent crimes which have substantial societal and economic costs. *Id.* at 563–64. Accepting such a "costs of crime" argument would permit Congress to "regulate not only all violent crime, but all activities that might lead

---

[5] In moving to dismiss the indictment, Defendant argued, in the alternative, that the Hate Crimes Act is facially unconstitutional and that the "catch-all" jurisdictional elements included in the statute are unconstitutionally vague and overbroad. Having found the statute unconstitutional as applied in this case, however, the district court declined to reach these alternative bases for dismissing the indictment. Defendant has declined to renew these alternative arguments before this Court, and I therefore do not reach them in resolving the instant appeal.

to violent crime, regardless of how tenuously they relate to interstate commerce," the Court said, which would unconstitutionally "'obliterate the distinction between what is national and what is local.'" *Id.* at 564, 567 (quoting *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 554 (1935) (Cardozo, J., concurring)).

*Morrison* involved a challenge to a provision in the Violence Against Women Act which established a federal civil remedy for the victims of gender-motivated violence. 529 U.S. at 601–02. There, the Supreme Court held that the statute exceeded Congress's power under the Commerce clause, emphasizing that "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity." *Id.* at 613. "The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States," the Court explained. *Id.* at 618. The Court also emphasized that the Violence Against Women Act, like the Gun-Free School Zones Act, did not have an interstate-commerce jurisdictional element. *Id.* at 613. Finally, the Court rejected "the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.* at 617; *see also id.* at 618 ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").

*Lopez* and *Morrison* are readily distinguishable from the present case. Most significantly, whereas the *Morrison* and *Lopez* Courts found it significant that the statutes at issue in those cases had no interstate-commerce jurisdictional element, the provision in

30

the Hate Crimes Act under which the government indicted Defendant includes such an element. That element requires that, to convict a defendant under the Hate Crimes Act, both a court and a fact-finder must conclude that the defendant's conduct "interfere[d] with commercial or other economic activity in which the victim is engaged at the time of the conduct." 18 U.S.C. § 249(a)(2)(B)(iv)(I). Notably, Defendant has identified no case in which a federal criminal statute including such a jurisdictional element has been held to exceed Congress's authority under the Commerce Clause, nor have I found any.

Additionally, the conduct giving rise to the prosecutions at issue in *Lopez* and *Morrison*—possessing a handgun on a school campus and domestic violence—did not interfere with ongoing interstate commerce or economic activity. By contrast, Defendant's assault of C.T. interfered with such ongoing activity by preventing C.T. from continuing to prepare packages for interstate sale and shipment. The *Lopez* Court itself recognized this critical distinction, stating flatly that "Congress is empowered to regulate and protect . . . persons or things in interstate commerce, *even though the threat may come only from intrastate activities*." 514 U.S. at 558 (emphasis added).

Finally, the slippery-slope concern animating the *Lopez* Court's holding—that allowing Congress to regulate the possession of guns in school zones would give Congress unfettered authority to regulate wholly intrastate conduct traditionally subject to regulation by the States—is not present here. Section 249(a)(2)(B)(iv)(I) authorizes federal prosecution of a hate crime *only* when the crime "interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct." As the government concedes, this provision does not give the federal government general

31

license to punish "crimes of violence motivated by discriminatory animus." *See* Appellant's Br. at 21. As authored, therefore, the Hate Crimes Act thus does not infringe on States' exclusive authority to regulate violent crimes—including hate crimes—unrelated to ongoing interstate commerce. For example, if Defendant had assaulted C.T. at a private residence while C.T. was not engaged in activity related to interstate commerce, then Defendant would not be subject to prosecution under the statute.

In sum, because conduct criminalized under the Hate Crimes Act necessarily "relates to an activity that has something to do with commerce or any sort of economic enterprise," *United States v. Gibert*, 677 F.3d 613, 624 (4th Cir. 2012) (internal quotation marks omitted), the statute does not open the door to pervasive federal regulation of violent hate crimes.

IV.

The immediate impact of Defendant's assault of C.T. on ongoing commercial activity demonstrates a sufficient relationship to interstate commerce to support Defendant's prosecution under the Hate Crimes Act. Because Defendant has thus far failed to make a "plain showing" to the contrary, *see Gibert*, 677 F.3d at 618, and assuming the government succeeds in proving its allegations at trial, I would find the statute is constitutional as applied in this case. Accordingly, for reasons not given in the majority opinion, the district court order to the contrary should be reversed and this case should be remanded with instructions to reinstate the challenged indictment.

With due respect to my colleagues in the majority, the issue of whether the government's prosecution of Defendant complies with the Commerce Clause is properly

32

before us. It should be resolved. Because the majority opinion elides that important issue, I must dissent.